520 P.2d 1151

The STATE of Arizona, Appellee,

v.

Dennis Keith SWAFFORD and Marilyn Rose Swafford, Appellants.

No. 2 CA–CR 347.

Court of Appeals of Arizona, Division 2.

April 5, 1974.

Rehearings Denied May 28, 1974.

Review Denied June 18, 1974.

Gary K. Nelson, Atty. Gen., by Howard L. Fell, Asst. Atty. Gen., Tucson, for appellee.

John M. Neis, Pima County Public Defender, Ed Bolding, former Pima County Public Defender, by John W. McDonald, Deputy Public Defender, Tucson, for appellants.

## OPINION

HOWARD, Judge.

Appellants were charged with the unlawful killing of their two and one-half

months' old son, James, in violation of A. R.S. §§ 13–456 and 457(A), as amended. The jury returned a verdict as to both of guilty of involuntary manslaughter and this appeal followed.

In the month of April, 1972, the defendants lived in a trailer with their three children James, Brian, age three and Christina, age one and one-half. The trailer next to defendants was occupied by a young couple, Sharon and Preston Bullock who had become acquainted with the defendants.

On April 4 or 5, 1972, Preston Bullock's mother, Heather, came to visit the younger Bullocks. Thirty-four years previously, Heather had been an English nanny, which is a professional children's nurse who works in private homes taking care of infants. The training of the English nanny consists of instruction under a registered nurse for six weeks and on-the-job training under a qualified nanny for about three months. She had been employed as a nanny for about four years and also did volunteer work for the welfare department in London. After she was married and throughout the years she cared for children of working mothers.

Having heard that the Swaffords had a baby, Heather asked if she could see him. Upon seeing him she was immediately impressed by his appearance. In response to Heather's inquiry Marilyn Swafford stated that James weighed five pounds and fourteen ounces at birth. Heather then weighed the baby on a scale in the Bullock trailer and discovered that he weighed only six pounds. Heather told Mrs. Swafford that she thought the baby was terribly thin and asked what the baby was being fed. Mrs. Swafford replied that he was being fed with Similac, baby cereal and sugar. Heather then inquired as to the daily bowel movements of the baby and was told that he had eight or nine. Heather informed Marilyn that this was too many for a child of that age and advised her to eliminate the sugar from his diet. She also told her that something was wrong with the baby, that he needed medical attention and that if a doctor were to suggest vitamins for the baby she would buy the vitamins if the Swaffords could not afford to do so. In further describing the baby, Heather stated that the child's jawline did not appear to be normally developed, there was no substance to his body anywhere at all and the skin appeared just like "thin plastic over bone".

Because of lack of transportation and her own telephone Heather waited two days until a telephone was installed at her residence and called the welfare department. It was not until April 11, 1972, that she was finally able to contact the supervisor of nurses. Heather told her that the baby needed immediate attention; that he looked worse than "the babies you see on television for the Biafra Fund"; that she had never seen anything like it in her life; that she told the mother to take the child to the doctor but did not think that she had done so; and that she did not think that the baby would last for three more weeks.[1]

Subsequent to the call to welfare and prior to April 26, 1972, Heather visited her son's trailer and on one occasion saw Mrs. Swafford. Mrs. Swafford told her the baby was doing better since she had taken him off the sugar and was having only two bowel movements a day. However, she had not yet taken him to see a doctor. When Mrs. Swafford said she was going to see a gynecologist the next day, Heather suggested that she take the baby with her in hopes that the gynecologist would refer the baby to a good pediatrician. Heather even offered to babysit for the Swaffords—her plan being that she would then take the baby to a doctor.

On April 26, 1972, Heather visited her son. She and her husband had devised a plan whereby they were going to invite the Swaffords to a barbecue and beer party at their home and while they were at the house, Heather would get the baby and take him to a doctor. As this plan was

1. Welfare never made a contact with the Swaffords until April 27, 1972.

being discussed with the younger Bullocks, Mrs. Swafford came banging on the door of the trailer yelling for them to call an ambulance and crying that the baby had stopped breathing. Heather exited from the trailer and met Mr. Swafford coming towards her with the baby in his arms. The baby was taken into the Bullocks' trailer where Heather laid the baby on the floor and started mouth-to-mouth resuscitation. She thought the baby was dead but finally got him to start breathing, although in a very irregular fashion. All during this time the Swaffords appeared to be extremely upset and distraught. The ambulance finally came and took the baby and his parents to the hospital.

While the baby was at the hospital the younger Bullocks and Heather undertook to care for the two other children, Brian and Christina. While Sharon Bullock put the children in the bathtub at the Bullock trailer, Heather went to the Swafford trailer to find some night clothes for them. In the trailer she saw a small car bed in which she found a baby bottle. When she picked the bottle up, its contents did not move. The milk in the bottle was so sour that she had to shake firmly to make it move into the bottom of the bottle. The nipple of the bottle was mildewed. Preston Bullock, who had accompanied Heather to the trailer, described the contents of the bottle as smelling sour and looked to him like cottage cheese that was moldy around the bottom. Heather searched the trailer and could not find any milk or Similac. She asked her son to get his camera and she took pictures of the inside of the trailer. According to Preston the trailer smelled badly. When she failed to find clothing for Brian and Christina, Sharon Bullock washed the clothes they had been wearing when she took them to her trailer. That evening the children ate at the Bullocks. According to Preston Bullock they ate as if they were hungry.

Preston Bullock testified that prior to the 26th he heard the baby crying and heard defendant Dennis Swafford shout to his wife to shut the kid up or else he would. He described the crying as sounding like a moan. He was of the opinion that the Swafford children were skinny.

The baby was first taken to St. Joseph's Hospital and then transferred to Tucson Medical Center where he was initially seen by a pediatrician, Dr. James W. LaBelle. Upon examination Dr. LaBelle found that the baby had no fat or tissue in the face area. His eyes were sunken and he had an extreme "old man look". The baby's genitals were excoriated with diaper rash. According to the doctor, he was more emaciated and malnourished than any other child he had ever seen.

When the child was brought into the emergency room at St. Joseph's, an intravenous cutdown was placed in his leg and he was given plasma. His respiration was very shallow, one to two per minute, and his temperature was approximately 94°. As soon as the body started breathing at a rate of about twelve per minute, he was transferred to Tucson Medical Center where several laboratory tests were performed. The spinal tap was essentially normal at that time. A blood count showed that the child's hemoglobin was low and a transfusion of whole blood and antibiotics was given. When Dr. LaBelle first saw him, the baby was having frequent seizures and convulsions. This indicated to the doctor that the child had suffered brain damage.

In further describing the child he stated there was an extreme wasting of subcutaneous tissue in the ribs and the long bones of the extremities could almost be seen through the skin. The knees appeared to be rather large because of lack of subcutaneous tissue. Also, the knees and arms were in flexion and were quite rigid on examination. There was an absence of sucking pads in the baby's cheeks which the doctor stated was usually one of the last things to go in severe malnutrition. Because of lack of fat underneath it, the skin had become wrinkled. In explaining the

flexed position of the extremities he stated:

"This infant on examination had flexion contracture of his knees and elbows in that the joints were held in a flexed position and this occurs secondary to any sort of a malnourished or extremely [sic] any sort of condition where a youngster or a person would be extremely ill and after a period of time the body becomes so weak that it cannot normally move about and so the flexed muscles will hold the body in a position so that it becomes flexed, in a flexed position."

Dr. LaBelle stated that rigidity of the extremities does not suddenly occur but would take a couple of weeks at a minimum. He had spoken to the defendants about the child's condition before he was brought to the hospital. They told him that the child had been well until the evening of the 26th when they suddenly found him in bed not breathing. The doctor told the parents that he felt the child had been ill for a long period of time, that the baby was in an extremely malnourished condition and felt it was impossible that the condition could have occurred in a period of less than twenty-four hours. The defendants reiterated to the doctor that the child had been well, had been eating normally, had been lifting his head up, getting on to his elbows and looking around up until sometime that day or the evening when he was brought to the hospital. Based on Dr. LaBelle's observations he did not believe what the defendants told him could have been possible. Nor did he believe that the child had been drinking Similac and had been eating a variety of infant foods. In response to his questions about any illness, the defendants told him the child had had a short bout with diarrhea approximately three weeks previously which lasted for several days but that he had recovered and there were no other problems. The parents denied that the child had had either chronic diarrhea or chronic vomiting.

The doctor also consulted with Drs. Harris and Semoff about the child. In Dr. LaBelle's opinion the child died from extreme malnutrition. He did not think that the meningitis caused the baby's death but was related to the malnutrition which had lowered the baby's resistance to infection. In both Dr. LaBelle's and Dr. Harris' opinion "heroic efforts" to prolong the life of the baby were not warranted since they believed that the baby had suffered extreme brain damage and would only have existed as a "vegetable".

Dr. Thomas R. Harris, a pediatrician who specializes in the care of new born babies also testified. His testimony was similar to that of Dr. LaBelle. He also was of the opinion that the child had died of extreme malnutrition as a result of insufficient caloric intake and not as a result of any mal-absorption syndrome of any kind. Both doctors were of the opinion that the meningitis did not cause death and that the child would have died of malnutrition even if the meningitis had not been present.

Dr. Louis Hirsch, the pathologist who performed the autopsy on the baby agreed with the conclusions of Drs. LaBelle and Harris.

Further testimony will be set forth in the body of this opinion in conjunction with appellants' contentions of error.

Appellants present the following questions for review:

"1. Were the defendants denied a fair and impartial trial and due process of law because the trial court instructed the jury on three alleged misdemeanor violations, to wit, A.R.S. §§ 13–801, 13–822 and 13–842?

2. Were the defendants denied a fair and impartial trial and due process of law by the admission into evidence of State's exhibit 10, to wit, a medical book which was the fruit of an illegal search and seizure?

3. Were the defendants denied a fair and impartial trial and due process of law by the admission of testimony concerning:

A. A prior death of one of appellant' children, and;

B. The general parental fitness of the defendants and the care and condition of defendants' children in general?

4. Were the defendants denied a fair and impartial trial and due process of law by the admission into evidence of State's Exhibit 4, to wit, five color slides of the deceased?

5. Were the defendants denied a fair and impartial trial and due process of law by the failure of the trial court to grant instructions on lesser included offenses?

6. Assuming *arguendo* questions 1–5 will not independently support reversal were defendants denied a fair and impartial trial and due process of law by the cumulative prejudice resulting from the errors in questions 1 through 5?

7. Is A.R.S. § 13–822 unconstitutionally vague and therefore violative of the constitutional guarantee of due process of law?

8. Does A.R.S. § 13–456 violate the guarantee of due process of law provided by the Fifth and Fourteenth Amendments to the Constitution of the United States?

9. Even if defendants' convictions were proper were the sentences imposed excessive in view of the facts and circumstances of the case?"

## INSTRUCTING THE JURY ON ALLEGED VIOLATIONS OF A.R.S. §§ 13–801, 13–822 and 13–842.

The pertinent misdemeanor statutes complained of are as follows:

(§ 13–801)

"A. A parent who wilfully omits, without lawful excuse, to furnish necessary food, clothing, shelter or medical attention for his or her minor child is guilty of misdemeanor . . . .

(§ 13–822)

A. A person who by any act, causes, encourages or contributes to the dependency or delinquency of a child, as defined by § 13–821, . . . is guilty of a misdemeanor . . . .

(§ 13–842)

A. A person having custody of a minor under sixteen years of age who wilfully causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a misdemeanor."

A.R.S. § 13–821(A), par. 1(g) defines a dependent person as a person under the age of eighteen years whose home, by reason of neglect, cruelty or depravity of his parents, or either of them, is an unfit place for such person.

■ It is appellants' contention that the case of State v. Hunt, 2 Ariz.App. 6, 406 P.2d 208 (1965) controls and error was committed by instructing on all three misdemeanors. We do not agree. In the *Hunt* case the co-defendants were charged with aggravated assault on their five year-old daughter. In addition to the aggravated assault they were charged with three misdemeanors, violations of A.R.S. § 13–801, 13–822 and 13–842. This court held that the three misdemeanor statutes were duplications of each other and that the conduct could not be split into two or more offenses for to do so would violate A.R.S. § 13–1641 which prohibits double punishment for one act.[2] The *Hunt* case is entirely inapposite to the facts of this case. Defendants were charged with involuntary manslaughter which is the unlawful killing of a human being without malice in the commission of an unlawful act not amounting to a felony. They were not charged with several counts of manslaughter but only one. It is therefore evident that the double punishment statute is not involved.

2. The statutes involved do not all cover the same type of conduct. A.R.S. §§ 13–801 and 13–842 require intentional acts. See Branham v. State, 33 Ariz. 170, 263 P. 1 (1928). A.R.S. § 13–822 refers to "any act" which includes *negligent* conduct.

## THE ILLEGAL SEARCH AND SEIZURE.

During the cross-examination of Marilyn Swafford the prosecutor introduced into evidence a book entitled "Home Health Guide and Medical Encyclopedia" which had been found in the trailer previously occupied by the defendants. The defense made no objection to the admission of the book on the grounds of illegal search and seizure at the time it was offered. It was not until later in the trial that an objection was raised and a motion for mistrial made on that ground.

Marilyn Swafford had testified that the trailer with certain other personal property had been repossessed by the trailer sales company during the period when they had returned to Indiana to bury the baby and after their release from jail. Although it had been a year since the trailer had been repossssed the defendants made no effort to contact the company.

The State claims that the defendants waived any objection to the introduction of the book into evidence by failing to make a timely objection. In Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) the effect of a state procedural rule requiring contemporaneous objection to the admissibility of evidence vis á vis important federal rights was discussed. There the court stated:

"... [A] litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest. ...

The Mississippi rule requiring contemporaneous objection to the introduction of illegal evidence clearly does serve a legitimate state interest. By immediately apprising the trial judge of the objection, counsel gives the court the opportuntunity to conduct the trial without using the tainted evidence. If the objection is well taken the fruits of the illegal search may be excluded from jury consideration, and a reversal and new trial avoided. But on the record before us it appears that this purpose of the contemporaneous-objection rule may have been substantially served by petitioner's motion at the close of the State's evidence asking for a directed verdict because of the erroneous admission of the officer's testimony. For at this stage the trial court could have called for elaboration of the search and seizure argument and, if persuaded, could have stricken the tainted testimony or have taken other appropriate corrective action. ..." 85 S.Ct. at 567-568.

█ It thus appears from the *Henry* case that if an objection is made at some point in time during the trial where the court may take the action suggested by *Henry*, then the objection will be considered timely unless it appears that counsel deliberately bypassed the opportunity to make a timely objection.

█ Appellants' excuse for not objecting was the fact that the prosecution concealed from defense counsel the circumstances of obtaining the book. Defense counsel asserted it was not until a member of the sheriff's department testified that he realized the book was obtained by the sheriff from the repossessed trailer.

The record belies appellants' contention. The book was first shown to Marilyn Swafford for identification. Upon being asked if she recognized the book she stated, "You got that out of our trailer." On redirect defense counsel elicited from Mrs. Swafford the fact that the trailer had been repossessed with all of its contents.

When the State offered the book into evidence the appellants made the following objection which was overruled:

"I have no objection except that all of the matters that were in it at the time are not there, your Honor. I object to that, your Honor, because it is not in the same condition it was at the time Marilyn last saw the book.

THE COURT: What matters are you talking about, book marks and cards?

MR. BOLDING: Yes, if we can see the other matters that were in the book, . . ."

The other matters which defense counsel referred to were holy cards, scripture readings, prayer readings and newspaper clippings which, according to Mrs. Swafford, were in the book.

The evidence strongly suggests that defense counsel deliberately chose not to object on search and seizure grounds in order to place before the jury the religiosity of Mrs. Swafford and further seek discovery of items in the trailer. This conclusion is buttressed by what later occurred. Defense counsel requested the court to call the prosecutor to the witness stand. The record reflects the following colloquy:

"MR. BOLDING: Yes, your Honor. What I am seeking is the source of the book, where the book came from, what else was present in the book at the time it was received, from where it was received, what the other items that would be of benefit to the defense in this presentation here, where those items were taken, what items were turned over to the County Attorney's Office that have not been produced here in Court and that is my general line of questioning, your Honor.

THE COURT: It sounds to me like it is a general discovery inquiry that you propose.

MR. BOLDING: Plus I am going to direct attention to this book itself, your Honor.

THE COURT: Well, the book is already in evidence. What do you propose to go into as far as the book is concerned?

MR. BOLDING: I want to see the condition it was in when the County Attorney received it, see what else the County Attorney took out of it. That would be material to the jury's consideration of this book, your Honor."

The court refused to allow defense counsel to call the prosecutor as a witness but did allow him to make an offer of proof

via testimony of an investigator from the county attorney's office and the person who brought the book to the courtroom during the trial.

Prior to the offer of proof, a motion to suppress the book was made on the basis of an illegal search and seizure. In explaining his tardiness in raising this issue defense counsel stated to the court:

"MR. BOLDING: I did not anticipate until the Court told me I couldn't call Mr. Stevens as a witness, I didn't anticipate even asking that the book be suppressed and that was my entire reasoning in the matter. I was going to go through the matters with Mr. Stevens and find out the source of the book and find out where the other materials are. When the Court made the ruling that I couldn't call Mr. Stevens, then I made the motion to suppress."

The court denied the motion to suppress.

The witnesses were called pursuant to the offer of proof. They testified that they did not know where the prosecution got the book, that it contained no other items and that they did not know the location of the personal property that was in the Swafford trailer.

Defense counsel then made an oral motion under Rule 195, Ariz.R.Crim.P., 17 A. R.S. (pre-September 1, 1973, Criminal Discovery Rule), for production of all items of personal property taken by the State from the trailer. This motion was also denied and the deputy sheriff testified as to obtaining the book. The motion to suppress was not renewed. Four trial days later after both sides had rested, the defense moved that the book be suppressed, or in the alternative, for a mistrial. Both motions were denied.

The hollowness of appellants' claim that they did not know there was any basis for a motion to suppress is demonstrated by what occurred when the deputy sheriff testified. The deputy sheriff testified:

"Q. And did you contact somebody out there and asked [sic] them about going into the trailer?

A. Not myself, I didn't.

\* \* \* \* \* \*

Q. Was there somebody standing there that opened the door for you when you went into the trailer?

A. When we got to the trailer sales office, we spoke with the manager there and arrangements had been made prior to getting there.

MR. BOLDING: I object to 'arrangements being made', your Honor.

THE COURT: Objection sustained."

No motion was made to strike th t part of the answer concerning "arrangements". The sustaining of the objection did not eliminate the answer already given from the record. Nungaray v. Pleasant Val. Lima Bean Growers & Warehouse Ass'n, 142 Cal.App.2d 653, 300 P.2d 285 (1956); People v. Carmen, 43 Cal.2d 342, 273 P.2d 521 (1954).

A supplemental report in regard to the search made by the deputy was handed to defense counsel in open court during the cross-examination of this witness. After having heard this testimony and read the report, defense counsel made no motion to suppress.

There was no reason for the court to sua sponte raise the issue at that time since it appeared from the testimony of the deputy sheriff that the search was conducted with the consent of the persons who then owned the trailer.

The appellants had an opportunity to object to the admissibility of the book when it was offered and to move to suppress when the deputy sheriff testified. It is evident that their failure to do so was the result of defense counsel's trial tactics. The court did not err in refusing to grant the appellants' motions.

TESTIMONY CONCERNING THE DEATH OF ONE OF APPELLANTS' CHILDREN AND APPELLANTS' GENERAL PARENTAL FITNESS AS TO THE CARE AND CONDITION OF ALL THEIR CHILDREN

The thrust of appellants' defense at trial was that they did not notice anything wrong with James. Marilyn Swafford testified that they had enough money to buy food and always bought food before making any other purchases. Appellants first contend that the prosecution, in spite of a warning by the court, brought up the issue of the death of Christina's twin brother in Indiana.

The following testimony was elicited from Marilyn Swafford on cross-examination:

"Q. How many [young babies] would you say you have seen?

A. I don't know. Six or seven maybe.

Q. Any of them look like this baby?

A. Yes.

Q. Your other three or other two?

A. Other two."

█ We do not agree with appellants' contention that the foregoing series of questions and answers related to the dead twin brother. The question "Your other three, or other two?" meant whether the six or seven children that she had seen in the past looked like all three of her children or just Brian and Christina.

Appellants next contend that improper testimony was allowed concerning a referral slip in the file of Mrs. Ruth Unger, a defense witness. In order to meet this contention it is necessary to set forth Mrs. Unger's direct testimony. She testified she had been with the Pima County Welfare Department since 1966 and with its child protective services since 1968. Initially she was employed in the intake process for aid to dependent children and aid to the blind. After that she worked with family and child welfare services. Her job was to answer protective service referrals and do intake for welfare service to children. Protective services is a specialized area of child welfare. Its function is to prevent

abuse or neglect of children. Mrs. Unger's job was to go into the home and make an evaluation to see if there were any problems and stabilize and make the home a happy and safe one for parents to raise their children. At the time of trial she was on educational leave, working on her masters degree in social work at Arizona State University. She had a bachelor's degree in sociology and psychology. Prior to 1966 she worked with the social service division of Coney Island Hospital in New York.

Mrs. Unger described the duties of an intake worker as taking referrals and acting on them. She had handled more than 2,500 cases while with the Pima County Welfare Department. Her job required that she go into and make an evaluation of the home and make a prognosis as to "how she believes the outcome will be with the family." She enumerated the various things she looked for in the parents and children in order to make her diagnosis and prognosis. This included how the parents were getting along with the children, what they did if a child cries and hazards in the home such as rubbish and dirt. As to the child, she looked at his body, whether he was suffering from malnutrition and inspected his clothing and where he slept and played.

She was trained in child care and child nutrition and had written several papers in her field of endeavor. On each case she made a written report. The report was checked by her supervisor who approved or disapproved of her course of action. As part of her job she made a determination as to whether children should remain in the home.

Mrs. Unger brought the entire Swafford file to court. This file had previously been made available to both prosecution and defense counsel and she referred to the file during her direct examination. In response to a question by defense counsel she stated that her first contact with the Swaffords was in September of 1971 by virtue of a referral concerning Christina

from St. Joseph's Hospital to Child Protective Services. She went to the home and met the family. She examined Christina who appeared normal to her and found nothing wrong. She stated the home was adequate and she observed nothing hazardous to the children. She saw Brian and he looked healthy to her. She saw no reason to extend protective services to the family.

She did not see the Swaffords again until April 27, 1972, when Dr. Semoff at Tucson Medical Center referred James' case to protective services. Prior to seeing James she spoke with Mrs. Fisher, a social worker at St. Joseph's Hospital. She talked to Dr. LaBelle and then went to the trailer to talk to the Swaffords. She found the Swaffords sleeping on the floor when she came in. She did not believe however that the trailer could be considered dirty or messy. She found the trailer adequate and there was no junk and litter. She did notice the baby car bed and a birdcage over it containing feathers and droppings but did not see any debris from the birdcage in the car bed. She saw a bottle on the car bed but did not pick it up and look at it. She examined Brian and Christina but did not observe anything remarkable. The children appeared to be clean and adequately dressed. At that time she saw no reason for protective services. Her supervisor requested an examination at the hospital. This was done and Brian and Christina were found in excellent health. Mrs. Unger still thought no protective services were necessary and her supervisor concurred.

In further response to questions by defense counsel she stated that she thought that Mrs. Swafford had a deprived childhood and that the Swaffords had a "blunted threshold of perception". By this she meant that they did not get the cures that the average person might get from observing a child. She thought they needed education about child care.

Defense counsel then asked, based upon all of her experience, training, work with the welfare department and protective

services division, examination of the Swafford home, knowledge and appearance of James, knowledge and experience of seeing Brian and Christina, her findings and investigations, if she had an opinion as to whether the defendants intentionally neglected James. She stated that in her opinion they did not intentionally neglect James. She stated that in arriving at that opinion she was aware of all the welfare records she had with her and of other matters not in the records, including talking with other social workers and welfare records from Indiana.

On cross-examination the prosecution asked Mrs. Unger whether her opinion was based upon all the welfare records including the welfare records from Bloomington, Indiana that she received after April 26, 1972. She stated that her opinion was based upon everything that she knew about the Swaffords including the Indiana records.

On cross-examination regarding the referral from St. Joseph's Hospital on Christina, she stated there was nothing in her records indicating Christina was ill and that the referral merely said "check out Christina's vulva and rectal areas, swollen and sensitive". She also stated that no investigation was made of Christina's hospitalization at St. Joseph's because the specific referral from St. Joseph's stated: "Check the baby now and see how the baby is". At that point the prosecutor asked her to read the referral slip that was in her file. She complied and read the following:

". . . The child was brought in with an eye infection a few months ago. Since then, a neighbor, Mrs. Allen, above address, apartment No. 1, brought the child to hospital with roach bites. Scarring on buttocks when originally brought in (5–11–71, filthy, sores, vulva, rectal area swollen, sensitive, child not too responsive, parents have very poor hygiene, mother quite dumb and irresponsive father 10th grade and mother 9th grade. I believe must be education. *Christina, twin other, died, also death of another child?, also another taken away,* child seen at St. Joseph's last week. Still placid.)" [when questioned as to the referral slip Mrs. Unger stated that all the referral slip said was that Christina was brought in with an eye infection a few months ago.] (Emphasis added)

Defense counsel vehemently objected to the reading of the referral slip. He contended that it was not only improper for Mrs. Unger to read the referral slip but that the information contained therein was erroneous since the referral slip made it appear there were two other dead children and that another child had been taken away. Upon redirect examination Mrs. Unger testified that a letter in her file indicated that there was only one dead child in Indiana who had died of pneumonia and that the other child had not been taken away but was voluntarily given up for adoption by Dennis Swafford's sister.

Appellants argue that allowance of the testimony concerning the contents of the referral slip constituted prejudicial error since it referred to prior bad conduct of appellants and had no relevancy. They further contend that the allowance of such testimony into evidence was inconsistent with a previous ruling by the court on direct examination that Mrs. Unger could not testify as to a conversation she had had with Mrs. Fisher. In that particular conversation appellants attempted to elicit from Mrs. Unger what Mrs. Fisher had told her about conversations with the doctors. In other words, hearsay upon hearsay.

The State contends that the appellants opened the door to the testimony concerning Christina and the referral slip because of the testimony of Ruth Unger. In particular the State points out that Mrs. Unger's opinion was based on the contents of the file and also her observations and experience with Brian and Christina. Appellants contend that they did not open the door but were forced to elicit such testimony because of the Bullocks' testimony.

We first note that the opinion evidence of Mrs. Unger was admitted without objection on the part of the State.

■■ Where the expert has based his opinion on what could be considered hearsay, the hearsay objection does not apply to the cross-examination of such expert witness. Jarrett v. State, 500 P.2d 1027 (Wyo.1972). It is the further rule that once an expert offers his opinions he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based and which he took into consideration and may be subjected to the most rigid cross-examination concerning his qualifications and his opinion and its sources. People v. Nye, 71 Cal.2d 356, 78 Cal.Rptr. 467, 455 P.2d 395 (1969).

■■ The evidence in the referral slip regarding Christina was clearly admissible in view of the fact that the defense opened the door on that issue. The State scrupulously stayed away from any evidence regarding Christina's referral to Child Protective Services until such time as the door had been opened by the defense. The testimony of the Bullocks concerning Brian, Christina and the condition of the trailer on April, 1972, was relevant and admissible in view of the unlawful acts which formed the basis of the crime charged and in particular A.R.S. § 13–822(A).

■ We find difficulty in characterizing the testimony as to the death of the other child and the adoption of the other child as testimony of "prior bad acts". We do see, however, that there is a relevancy problem and that such testimony could in some cases have a prejudicial effect on the jury. Where the only effect of the cross-examination of a witness on collateral matters would be to prejudice the minds of the jurors, it should not be permitted. Brazee v. Morris, 65 Ariz. 291, 179⁻ P.2d 442 (1947). Assuming, but not deciding, that it was error to allow such testimony in this case, we find it to be harmless beyond a reasonable doubt in view of the overwhelming evidence in this case. This is especially true in view of the fact that under A.R.S. § 13–822 no wilful or intentional act is needed.

■ Appellants also cite as prejudicial error the testimony of Mrs. Fahr, a nurse at St. Joseph's Hospital concerning the hospitalization of Christina. She testified in rebuttal, on redirect examination by the State, that Christina was also treated at St. Joseph's Hospital for malnutrition. Upon objection this testimony was stricken from the record and the jury was instructed to disregard it. Even if the court had not stricken the testimony we do not believe that its reception into evidence would have been error. Mrs. Unger had been permitted to paint a glowing picture of the health of the other two children, Brian and Christina. Her opinion was based on having seen Christina. The nurse's testimony was admissible to impeach Mrs. Unger's opinion. Further, as Mrs. Unger stated: "If a child is being abused . . ., this is going to be a continuing thing." Again, under the crime charged it was proper to show the condition of the home and the other children in the home. Cf. State v. Cutshaw, 7 Ariz.App. 210, 437 P.2d 962 (1968).

## ADMISSION OF FIVE COLOR SLIDES

Appellants contend that the trial court abused its discretion in allowing into evidence five color slides of the deceased child. In evidence were two black and white photos of the deceased child when the slides were admitted.

■ The question of admissibility of evidence hinges on whether it has probative value. The same principle applies if the pictures are in black and white or in color. State v. Brady, 105 Ariz. 190, 461 P.2d 488 (1969). Dr. Harris testified that there were certain differences between the black and white photos prior to death and the color slides taken after death. He

stated that the condition of the deceased's face before and after death was important to note. He also testified that the condition before death was extremely similar to the condition after death, and that the comparison of the photos pointed up the extreme condition of the child. The doctor testified that the slides would more realistically demonstrate the condition of the child than would additional testimony. When defense counsel asked whether the doctor could point out by use of the black and white photographs the same things as could be pointed out by the use of the slides the doctor answered "not everything". The doctor further testified that one of the black and white photos did not accurately portray the condition of the deceased child's hair but that the slides would accurately portray such condition.

The trial court did not err in admitting the color slides into evidence.

## FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSES

 Appellants contend that the court erred in refusing to instruct the jury that it could find the defendants guilty of the lesser included offenses set out in A.R.S. §§ 13–801, 13–842 and 13–822. Instructions on lesser offenses are justified only when there is evidence upon which the jury could convict of a lesser offense, and, at the same time, find that the State had failed to prove an element of the greater crime. State v. Schroeder, 95 Ariz. 255, 389 P.2d 255 (1964). Appellants claim that their theory was that James was afflicted with cerebral meningitis, a malfunctioning thymus gland and possibly other severe medical problems which were not discovered at the autopsy because of inadequate medical testimony by Dr. Hirsch and James' death could well have been caused by something other than malnutrition. Appellants state that their theories were supported and corroborated by the testimony of the doctors. We do not agree. We do not find even the slightest evidence in the record to suggest that the death was

caused by anything other than malnutrition. In this case the record is such that appellants could only be guilty of involuntary manslaughter or not guilty at all. Under such circumstances instructions on lesser included offenses is not permitted. State v. Schroeder, supra.

## UNCONSTITUTIONALITY OF A.R.S. § 13–822(A)

 Appellants claim that A.R.S. § 13–822(A) is unconstitutionally vague by condemning "any act" which contributes to the delinquency or dependency of a child or anyone "who for any cause" is responsible for the delinquency or dependency. We do not agree. Such an attack on the statute has been specifically rejected by our Supreme Court in Brockmueller v. State, 86 Ariz. 82, 340 P.2d 992 (1959), cert. denied, 361 U.S. 913, 80 S.Ct. 258, 4 L.Ed.2d 184 (1960).

## THE CONSTITUTIONALITY OF A.R.S. § 13–456

 Appellants contend that A.R.S. § 13–456 is unconstitutional since it imposes punishment for manslaughter upon a wrongdoer whose only crime is a misdemeanor. We find this contention to have no merit. The question of whether or not Arizona should have a misdemeanor manslaughter rule is a legislative question and not one for the courts.

## EXCESSIVE SENTENCE

The appellants were each sentenced to not less than eight nor more than ten years in the Arizona State Prison. The maximum term for imprisonment for manslaughter is ten years. We have inspected the pre-sentence reports which were furnished to the trial court. Marilyn Swafford is now 23 years of age. She has completed the eighth grade of school. She is a product of a broken home and both of her parents are heavy drinkers. At the time of her marriage to Dennis she was fifteen years old and three months pregnant. Her husband was nineteen years

old. Both defendants are from Indiana. Because Marilyn felt that she was too young to have the responsibility of a child, the first child was given up for adoption to Dennis' sister. Since the marriage Dennis has worked at numerous jobs. He rarely stayed at one job for any length of time but generally found new jobs without excessively long periods of unemployment. In 1971 they received financial aid from the Pima County Welfare Department. Welfare Department records indicate that on June 10, 1971, Marilyn expressed her intention to use birth control pills to prevent other pregnancies. A contact was made with her by welfare on August 18, 1971 which revealed that Marilyn had received her Planned Parenthood card too late and was pregnant again (with James). She did not receive prenatal care during this pregnancy.

Having been married at the age of fifteen, Marilyn's history of salaried employment is limited. She was examined by the court clinic and by Dr. Gurland. He found her intellectually functioning in the low average range of intelligence. He stated that she is an individual who is attempting to better herself and would like to be a more successful person than in the past. The diagnostic impression was that Marilyn was a rather immature, culturally, economically, educationally, and emotionally deprived 22 year-old who made a rather inept attempt to become an adequate functioning adult. He stated that if Marilyn was guilty of anything, it was being ignorant and inept. In his opinion incarceration would be of little if no benefit to Marilyn. He stated she would adapt to the jail-type setting but this would not provide her with decent social modeling or do anything to rehabilitate her. He suggested that she be placed on a probation program which would hopefully include day care programs in which social modeling in appropriate types of behavior could be stressed. He also suggested placing her in some formal educational program to assist her in passing a GED and obtain a job which would increase her self esteem and allow her to care for herself. Another recommendation he suggested was that she receive instructions in how to be a parent and how to cope with her children. It also appeared to him that Brian was in need of ongoing therapy since he sounded like an extremely anxious, emotionally upset child. A psychologist who also examined Marilyn described her as being immature.

The court clinic psychologist described Marilyn as "manipulative, subtly domineering, and evidences a general impoverishment of human relationships." He also stated "Ms. Swafford first presents as an almost comic opera parody of the dumb hillbilly, a pose belied by her adroit avoidancy of attempts by the examiner to probe her deep-seated emotional life." He recommended probation, preferably in Indiana from which social milieu her peculiar personality had sprung. He also suggested that she be restrained from the care of children.

The probation officer stated:

"In examining the alternatives in this case, this officer must reject incarceration as a desirable disposition. The philosophy of probation, as seen by this officer, views incarceration as suitable when placing a person on probation would endanger the community. It is felt that the danger posed by the defendant is limited to her influence on her two surviving children."

The probation reports also revealed that Marilyn has had a tubal ligation since the trial and has no prior criminal record.

Dennis Swafford is 28 years of age. He is described as having a passive-aggressive personality and borderline intelligence. Although he is not mentally retarded his abstract reasoning is almost nil. He has a prior civil offense which occurred in December 1967, when he was charged with the theft of a Christmas tree. He too is the product of a broken home. He received an honorable discharge from the military although he was AWOL three

times. The staff psychologist of the court clinic who examined Dennis stated:

> "Since 'rehabilitation' is a moot point in this particular case and in view of the fact that Mr. Swafford really would not understand why he is being punished, it is recommended that he receive probation."

The pre-sentence reports present the picture of an immature 15 year-old girl marrying and becoming a mother at far too early an age. She has received little help from a husband who operates on borderline intelligence. This case presents a classic example of the fact that although nature has endowed each individual with reproductive organs, not everyone should become a parent. The sentencing of a criminal defendant has to be one of the most difficult tasks which faces a trial judge. In the sentencing process paramount consideration should be given to the protection of the public although punishment is a valid consideration in the sentencing process, it is not an end in and of itself. It would indeed be short-sighted to thus view punishment when one considers that the imprisoned felon will be released after serving his sentence only to face the same opportunities that existed in the past. Therefore, public protection can only be realized to the extent the sentencing and correctional system is geared to reducing the likelihood of a repetition.

While the primary justification for a prison term is the protection of the public, there will be other cases where a prison term is indicated. One instance is when the seriousness of the offense is inconsistent with a sanction other than imprisonment. Another would be where an institution offers prospects of rehabilitation which are better suited to the needs of the defendant. We do not believe a judge abuses his discretion when he does not follow the recommendations of the probation department. We do believe that the crime in this case is serious and that the community attitude against such conduct is very strong. We do not believe that the trial judge abused his discretion in sentencing the defendants to a prison term. However, we believe that under the circumstances of this case the interest of society would best be served by a reduction of the sentence.

 The judgments of conviction are affirmed and the sentence as to both defendants is reduced to not less than one nor more than two years in the Arizona State Prison.

HATHAWAY, C. J., and KRUCKER, J., concur.