586 P.2d 1302

**STATE of Arizona, Appellee,**

v.

**Robert Fred RUPP and Jacqueline Rosemary Rupp, Appellants.**

**Nos. 1 CA–CR 2402, 1 CA–CR 2403.**

Court of Appeals of Arizona,
Division 1,
Department B.

Sept. 21, 1978.

Rehearing Denied Nov. 1, 1978.

Review Denied Nov. 28, 1978.

John A. LaSota, Jr., Atty. Gen., by William J. Schafer, III, Chief Counsel, Criminal Division, Diane M. DeBrosse Hienton, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by H. Allen Gerhardt, Jr., James L. Edgar, Deputy Public Defenders, Phoenix, for appellant Jacqueline Rosemary Rupp.

Martin & Feldhacker, by Gregory H. Martin, Phoenix, for appellant Robert Fred Rupp.

## OPINION

EUBANK, Judge.

William Thomas Allen Rupp (Billy), appellants' son, died on April 21, 1975, three days before his second birthday. It was stipulated in the trial court that he died of starvation. Appellants were subsequently charged, jointly tried and convicted of the crime of involuntary manslaughter (A.R.S. § 13–456(A)(2). The appellants have filed separate appeals which have been consolidated in this Court for disposition. We will consider the various contentions raised by each of the appellants after stating the generally relevant facts.

Billy was appellants' third child. He appeared to be healthy as a newborn baby. His mother stated to an investigating officer that he achieved a maximum weight of 15 pounds. When he died, he weighed 10 pounds and his body was 26 inches in length. The pathologist who performed the autopsy testified that the average weight for a child of his age at the time of death is 27.7 pounds and that the average body length is 34.4 inches.

Although neither of appellants testified at the trial, there was evidence presented that people who observed the child became concerned about his condition at the age of six months and thereafter. He was described as being thin, small, pale and listless. As time passed, it became apparent that his motor development was slow. He did not talk or crawl in the usual manner of a normal child prior to his death. He did not sit up by himself and he had difficulty holding his head up. He was less than normally responsive to his surroundings. His tongue was described as thick and it frequently hung out of his mouth. Billy vomited frequently and suffered from diarrhea. Identifiable undigested food often appeared in his stool.

It appears that Billy was not taken to a doctor until November 12, 1974, when he was little over 18½ months old. On two occasions prior to that time, persons related to one or the other of appellants contacted public welfare authorities out of a concern for Billy's health. These calls resulted in three visits to appellants' house by representatives of the Children's Protective Services Agency of the Department of Economic Security. During each of these visits, the representatives advised and urged appellants, or one of them, to obtain medical attention for Billy. The last such visit was in October, 1974, and resulted from appellants' failure to comply with a previous recommendation of the agency to take Billy to a doctor. By this time, appellants suspected that Billy might be mentally retarded and during this last visitation by a Chil-

dren's Protective Services' worker, Jacqueline Rupp was informed of facilities in the community for evaluating retarded or possibly retarded children.

After this visit, Jacqueline made an appointment to take Billy to Dr. William Luke, a general practitioner of the osteopathic school of medicine, on November 12, 1974. What occurred at Dr. Luke's office at this time was the subject of considerable testimony at the trial, much of it conflicting.

Luke testified that Billy was brought in solely for the standard "DPT" and polio immunization shots. He further testified that his procedure in such cases was to perform no more than a routine chest examination to negative the existence of upper respiratory infection. He testified that he performed this with a stethoscope without undressing the child. He took no history of the child and he testified that Jacqueline Rupp made no mention of Billy's vomiting or digestive problems. He did notice that Billy was thin like appellants' other children ("they are not healthy children"), but stated that he did not consider him to appear undernourished. In response to a question at trial, Luke estimated Billy's weight at the time at 18 to 20 pounds.

Luke testified that Jacqueline Rupp asked him if Billy was retarded. Luke did not respond either affirmatively or negatively but stated that this could be determined "in six months" when the child was two years old. There was evidence to the effect that Luke placed the child on the floor so as to better observe his manner and responsiveness. Luke testified that he actually formed an opinion at this time that Billy was retarded but that he felt it best not to communicate his opinion to Jacqueline Rupp. There was testimony from another source that Luke advised appellant that Billy also had a problem with his spine. Luke testified that he "had the feeling" after seeing Billy that the child might not live to adolescence. He did not communicate that thought to Jacqueline Rupp.

Either Luke or his assistant administered the first series of inoculations to Billy on November 12. Pursuant to instructions, Billy was brought back to Luke's office on December 27, 1974, for the second series of immunization shots. These were administered by Luke without his making any new or different observations. Jacqueline Rupp was instructed to bring Billy back for the third and final round of shots in four to eight weeks. This was not done and Billy was not taken to any other physician or medical practitioner prior to his death. However, Jacqueline Rupp took one of her older sons to Dr. Luke's office for treatment of a cold or flu condition on April 17, 1975. There was testimony that on the latter occasion, she stated to Dr. Luke that Billy was not eating well. This was four days before Billy died.

At the time of death, Billy's nose was observed to be caked with mucous. He was suffering from severe diaper rash accompanied by severe excoriation and ulceration of the skin in the genital area. There were decubitus ulcers (pressure or "bed sores") in the buttocks and lower back areas. There had been a substantially complete loss of subcutaneous fat which made the bones and joints appear prominent. Dr. Luke testified that pictures of the child taken immediately after death indicated a marked loss of weight since Billy's visits to his office. The physician who performed the autopsy testified that there was a total absence of food or traces of food in the gastrointestinal tract and that normally it takes two to three days for food to pass entirely through the tract. This physician found no disease process present and therefore concluded that starvation was the cause of death.

One of appellants' principal contentions at trial was that Billy's starvation death was caused by celiac disease or some other type of "malabsorption syndrome." Celiac disease is caused by an intolerance to the gluten found in many grain products and is accompanied by a blunting of the villi or absorbing arms of the small bowel. This and any other form of "malabsorption syndrome" results in an inability to absorb food into the blood stream. The autoptic physician found no evidence of celiac disease or any other malcondition relating to digestion but acknowledged that he could not eliminate the possibility of some such condition.

## PRELIMINARY HEARING

■ Appellants claim that they were denied due process of law at the preliminary hearing when the county attorney assertedly carried on an *ex parte* conversation with the magistrate during a court recess, depriving them of an opportunity to argue their legal position against the admissibility of certain evidence.

When appellants raised this issue at the preliminary hearing, the magistrate stated in response that there was no *ex parte* communication and that he consulted a legal authority (*Udall on Evidence*) upon his own initiative. Following a hearing, appellants' motions for a redetermination of probable cause were denied in the trial court. The existing record does not support appellants' claim and we find no error.

■ Appellant Jacqueline Rupp also contends that since the magistrate permitted her to present evidence at the preliminary hearing, the magistrate could not fail to find an absence of probable cause. Appellant bases this contention on Rule 5.3(a), Rules of Criminal Procedure, 17 A.R.S., which provides in part as follows:

The magistrate shall allow the defendant to present the offered evidence, unless he determines that it would be insufficient to rebut the finding of probable cause.

This contention is frivolous. The quoted portion of Rule 5.3(a) is designed to encourage the early termination of a criminal proceeding in situations where the accused is in a position to rebut and does rebut a *prima facie* showing of probable cause. A magistrate may conceivably err in his evaluation of an offer of proof or the evidence actually adduced may not be as represented in the offer. The magistrate remains under a continuing duty to ascertain, after all evidence has been presented, whether or not probable cause exists. Rules 5.3 and 5.4, Rules of Criminal Procedure, 17 A.R.S. Thus, the mere fact that the magistrate permitted appellant to present evidence did not mandate a finding of no probable cause.

## PROSECUTORIAL CONFLICT

Jacqueline Rupp consulted Donald W. Harris, a member of the Bar, shortly after Billy's death. Mr. Harris subsequently became the Maricopa County Attorney. Appellants thereafter moved for a change of prosecutor. The motion was not resisted by the Maricopa County Attorney, and Gerald Till of the Coconino County Attorney's Office was named special prosecutor. Subsequently, on September 21, 1976, a Deputy Maricopa County Attorney appeared for the State when the case was called at a calendar call. Mr. Till was in Flagstaff at the time but available by telephone to the Maricopa Deputy County Attorney. The record indicates that just prior to the calendar call Till called the Maricopa County Deputy with whom it appears he had a tacit agreement that the latter would represent the State at the calendar call.

During this call, Till inquired how he would go about noticing the removal of a judge that he did not wish to hear the case. Till also asked whether the deputy could "suggest a particular judge or what judges would be good to notice." The deputy mentioned the judge to whom, as it turned out, the case had been assigned. Till and the deputy agreed to converse by telephone again when the identity of the assigned judge was known. They did so when the case was called on the calendar, and pursuant to Till's instruction, the deputy advised the court that the State would exercise its privilege of eliminating the assigned judge from hearing the case.

Based upon the foregoing facts, appellants moved for dismissal or, in the alternative, to disqualify Gerald Till from further participation in the case. There was a hearing at which Till testified that his decision in regard to the notice of change of judge was prompted at least in part by a newspaper report he had seen of a poll taken with respect to the Maricopa County judiciary. Till testified that he probably would have noticed the judge in question in the absence of his conversation with the deputy. The motions were denied, and appellants claim error.

■ Once this criminal case had been transferred to a special prosecutor, the Maricopa County Attorney's Office should have

ceased all of its participation therein except for such activities as were stipulated to by counsel and approved by the court. *See State v. Latigue,* 108 Ariz. 521, 502 P.2d 1340 (1972). All appearance of impropriety must be avoided. *State v. Latigue, supra.* Nevertheless, it credibly appears from the record that the Deputy Maricopa County Attorney who appeared at the call of the calendar was doing so as Mr. Till's *de facto* agent for that limited purpose as a matter of logistic convenience. It also appears that the communications in question were confined to the matter of who might be hearing the case and were generalized rather than focused upon the particular facts and issues of the particular litigation. The question of disqualifying Till called for a balancing of the effects of the previous objectionable conduct and the possibility of further similar involvement against the delay involved in finding and bringing another special prosecutor into the case. We believe that under all of the circumstances presented there was a reasonable basis for the trial court's refusal to order a second change of prosecutor. We accordingly find no error and no prejudice to the appellants by the court's action.

Likewise, a dismissal was not required. Appellants have not called to our attention any analogous authority which would require a dismissal. We distinguish the case of *State v. Burns,* 322 S.W.2d 736 (Mo.1959), most heavily relied on by appellants, on the basis of the much greater involvement of the offending counsel in that case. Under these circumstances, primarily procedural,

we concur with the ruling of the trial court denying the motion to dismiss.

## NOTICE OF CHARGE

■■ Jacqueline Rupp contends that she was not sufficiently advised of the charges against her. This occurred, she asserts, when the State obtained instructions on her alleged failure to provide medical treatment in violation of certain misdemeanor statutes, A.R.S. §§ 13–801, 13–822, and 13–842, without first citing those statutes as part of the prosecutor's information.[1] She further contends that she received no other notice that she was being charged with violating those misdemeanor statutes until trial.

In the information, appellant was charged with involuntary manslaughter in violation of A.R.S. § 13–455 and 13–456(A)(2). Involuntary manslaughter occurs when death results from the commission of an unlawful act not amounting to a felony, or from the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection. A.R.S. § 13–456(A)(2).

The record clearly shows that appellant had knowledge of the misdemeanor charges long before trial. At the preliminary hearing, counsel for the State made references to A.R.S. §§ 13–801, 13–822 and 13–842. Further, in a pretrial response in the Superior Court to a motion in limine by defendants, appellee stated that "[i]t is the State's position that the unlawful act or acts committed by the defendants were violations of §§ 13–801, 13–822 and/or 13–842." (See footnote 1).

1. The statutes read as follows:

§ 13–801. Failure of parent to provide for child; punishment; direction that defendant labor on public works; pay; duty of board of supervisors; limitation on labor

A. A parent who wilfully omits, without lawful excuse, to furnish necessary food, clothing, shelter or medical attention for his or her minor child is guilty of a misdemeanor punishable by imprisonment in the county jail for not to exceed six months.

§ 13–822. Contributing to delinquency and dependency; punishment; procedure

A. A person who by any act, causes, encourages or contributes to the dependency or

delinquency of a child, as defined by § 13 821, or who for any cause is responsible therefor is guilty of a misdemeanor punishable by a fine not exceeding three hundred fifty dollars, by imprisonment in the county jail for not to exceed one year, or both.

§ 13–842. Permitting life, health or morals of minor to be imperiled by neglect, abuse or immoral associations; punishment

A person having custody of a minor under sixteen years of age who wilfully causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a misdemeanor.

While it appears to be the general rule that involuntary manslaughter should be pleaded with specificity[2] the case of *State v. Benham,* 58 Ariz. 129, 118 P.2d 91 (1941), *overruled on other grounds, State v. Thomas,* 78 Ariz. 52, 275 P.2d 408 (1954), indicates that actual notice of the underlying charges may suffice. Here, it does appear that appellants had actual and therefore sufficient notice prior to trial that failure to provide adequate medical treatment and violation of the three misdemeanor statutes would be in issue. The posture of the case in this respect appears to be like that of *State v. Swafford,* 21 Ariz.App. 474, 520 P.2d 1151 (1974) where the jury instruction based upon the same misdemeanor statutes was approved. In addition, appellant failed to move the trial court to dismiss the information for insufficiency pursuant to Rule 16.5, Rules of Criminal Procedure, 17 A.R.S. and she is now precluded from doing so under the terms of Rule 13.5(c), *id.*

## DESTRUCTION OF EVIDENCE

 Jacqueline Rupp contends that her conviction should be reversed because the State failed to preserve a section of Billy Rupp's small bowel, or small intestine. The basis of her position is that the presence of celiac disease could have been ascertained if a section of the small bowel had been preserved. Celiac disease refers to a blunted or diminished condition of the villi or absorbing apparatus of the small intestine, resulting in "malabsorption" syndrome which is a failure of the body to take food into the bloodstream.

Dr. Jarvis, the doctor who performed the autopsy on Billy, testified that he examined the small bowel for indications of celiac disease and found none. He further testified that he did not save a section of the small bowel because it was unnecessary to his autoptic conclusion that death was caused by starvation and because in his

opinion it was highly unlikely that a microscopic examination would reveal the presence of the disease when a visual inspection did not.

Contrary to appellant's contention, we see no violation of the principles of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) or *State v. Fowler,* 101 Ariz. 561, 422 P.2d 125 (1967). It appears that Jarvis had a rational basis for not preserving a section of the small bowel, and we do not perceive that his good faith was called into question. The problem of what to preserve for possible evidentiary purposes and the extent of the duty where it exists presents difficult questions. *See State v. Maloney,* 105 Ariz. 348, 464 P.2d 793 (1970). A number of the relevant authorities, state and federal, were discussed in *People v. Eddington,* 53 Mich.App. 200, 218 N.W.2d 831 (1974). We see no breach of prosecutorial duty here.

## ADMISSION OF SLIDES

Jacqueline Rupp contends that the trial court erred in admitting a series of slides grouped under the heading "State's Exhibit 9." Dr. Jarvis, who performed the autopsy, stated that the slides consisted of displays of tissue taken from various organs of the deceased. According to Jarvis, he personally removed and preserved sections of various organ tissues but did not himself prepare the slides. Rather, the slides were prepared by laboratory personnel at his direction. While he did not witness their actions, he testified that the laboratory personnel, in accordance with standard procedure, probably dehydrated the tissue, placed it in paraffin, sliced it, and stained it before placing it on the slides. Dr. Jarvis testified at the trial that he was unable to detect the presence of disease during either his initial examination of the corpse or his examination of the tissue on the slides.

**2.** 2 Warren on Homicide 179, at 99 (1938), states the rule thus:

Where the offense of manslaughter is involuntary homicide, and involves no assault, but arises out of some negligence or fault from which death is a consequential and sometimes not a speedy result, the ordinary forms

are deficient, and the indictment must be framed upon the peculiar facts in order to convey any adequate information.
*See also* § 174 of the same authority; 2 Wharton's Criminal Procedure 290 (12th ed. C. Torcia 1975); 40 Am.Jur.2d *Homicide* § 222 (1968).

Appellant argues that since the body tissues underwent the above-described processing, they were altered and could not be admitted into evidence in accordance with the rules respecting the admissibility of real evidence. *See State v. Ritchey,* 107 Ariz. 552, 490 P.2d 558 (1971). Appellant further contends that there was insufficient identification of the slide tissues as coming from Billy's body since only Dr. Jarvis testified.

If there was error in admitting the slides into evidence the error was harmless. The essential function of the slides was to provide a portion of the factual basis for Dr. Jarvis's expert testimony. Arizona now follows the rule that if supportive factual material is of a type reasonably relied upon by experts in the formation of opinions, the material itself need not be admitted into evidence. *State v. Clark,* 112 Ariz. 493, 543 P.2d 1122 (1975).[3] *See also* Rule 703, Rules of Evidence, 17A A.R.S. From the record adduced, the slides in issue here consist of such material. The slides were prepared for the use of the expert. They are obviously not discernible by a layman and there is no suggestion that they could have been intelligently used or perceived by the jury prejudicially to appellant. There was accordingly no reversible error.

### ADMISSION OF PHOTOGRAPHS

Jacqueline Rupp contends that the trial court erred to her prejudice in admitting State's Exhibits 6, 7 and 8. These are photographs of Billy Rupp taken at the hospital shortly after his death. While the photographs may properly be characterized as gruesome, it is not suggested that they do not accurately depict the child at the time of his death.

Photographs may be admitted into evidence even though they have a tendency to prejudice the defendant in the eyes of the jury if they are relevant to an issue in the case. *State v. Purcell,* 117 Ariz. 305, 572 P.2d 439 (1977); *State v. Mohr,* 106 Ariz. 402, 476 P.2d 857 (1970); *State v. Swafford,* 21 Ariz.App. 474, 520 P.2d 1151

(1974). Here, the photographs in question were clearly probative as reflecting the visible condition of the child and they undoubtedly assisted the jury in understanding the oral testimony. The court in *Harrington v. State,* 547 S.W.2d 621, 626 (Tex.Cr.App. 1977), involving a prosecution for the murder of a two-year-old child, stated the principle which we believe applies here:

We agree that the photographs are gruesome; however, we do not agree that the gruesome nature of the photographs outweighs their probative value. Even to the untrained eye, the photographs show that the appellant's daughter was obviously suffering from an extreme degree of malnutrition. They were highly probative of whether the appellant knew that his daughter was malnourished. Therefore, we hold that the inflammatory aspects of the photographs are not such as to outweigh their probative value to the jury.

In our opinion, there was no abuse of discretion in admitting these photographs into evidence. *State v. Purcell, supra.*

### IMPEACHMENT OF DR. LUKE BY ROBERT RUPP

Robert Rupp called Dr. Luke as a witness. Rupp contends that he was erroneously denied the right to cross-examine and impeach Dr. Luke.

The request to cross-examine was extensively argued in chambers. Upon a careful review of the motion, the claims of hostility, inconsistency and the response thereto, we can find no abuse of the discretion vested in the trial court. *See State v. Ulin,* 113 Ariz. 141, 548 P.2d 19 (1976).

Moreover, if the trial court was in error in its ruling, prejudice to Robert Rupp appears to be lacking. Although Robert Rupp and Jacqueline Rupp were represented by separate counsel at the trial, they had a substantial identity of interest *vis-a-vis* Dr. Luke. The record discloses that counsel for Jacqueline Rupp vigorously and extensively

---

3. Such material is, of course, a proper subject of inquiry upon cross-examination. The trial court is vested with discretion in determining the reliability of supportive material, such as tests. *See United States v. Bowers,* 534 F.2d 186, 193 (9th Cir. 1976).

cross-examined Dr. Luke. Counsel for Robert Rupp subsequently re-examined Luke in a manner which he conceded amounted to cross-examination and counsel also elicited from investigators statements attributed to Dr. Luke which were at odds with his testimony. Thus, even if there was error, it was not reversible error.

## REFERENCE TO TREADAWAY TRIAL

In the course of cross-examining Dr. Keen, the Yavapai County Medical Examiner, who was called as an expert by Robert Rupp, the prosecutor inquired as to whether Keen had testified in the "Treadaway murder trial * * * a couple of years ago." Appellants objected and moved for a mistrial. The objection was sustained and the jury admonished to disregard the question. The motion for mistrial was denied.

The prosecutor stated that he was attempting by reference to Keen's testimony at the Treadaway trial, a much publicized proceeding, to challenge the accuracy of the witness's statement that he had performed over 1000 autopsies. The prosecutor indicated that he recalled that Keen had testified that he had performed some 600 autopsies at that time. Defense counsel had elicited on direct examination the fact that Keen had testified at other criminal trials.

Reference such as this to other trials and litigation are to be discouraged. Certainly, appellants' objection was well taken. We do not perceive, however, that prejudice to appellants inhered in the reference. The motion for mistrial was properly denied.

## SUFFICIENCY OF THE EVIDENCE

Both appellants challenge the sufficiency of the evidence to support the convictions. Robert Rupp also challenges the denial of a directed verdict on the issue of failure to feed the child on the ground that there was no evidence of such failure.

In regard to failure to feed the child, the relevant fact is the stipulated one that the child died by starvation. While the case was tried upon the theory that starvation might result from bodily malfunction or disease, the expert who testified on behalf of Robert Rupp observed at one point: "Starvation to my way of interpretating the term is a malnourishment, usually connotes or signifies a withholding of adequate nourishment." Further, there was evidence from which the jury could have concluded that the child lost weight in the last months of his life. There was no trace of any food at all in his alimentary tract at the time of autopsy, and testimony was given that it takes two to three days for food to pass entirely through the digestive tract. This Court must view this and all other evidence in the light most favorable to sustaining the verdict, and we cannot substitute our judgment on the facts for that of the jury unless there is a complete lack of evidence in support of the verdict. *State v. Rhodes,* 112 Ariz. 500, 543 P.2d 1129 (1975). Considering the evidence in light of this requirement, we must conclude that while there was evidence that the child was fed on many occasions, disease was not established and the facts referred to above are sufficient to sustain a verdict of guilt based upon the failure to feed the child.

There was also sufficient evidence to support the conviction based upon failure to provide medical care. Although the child was finally taken to a doctor, there was evidence that the principal object of the visit was to obtain immunization shots and that nothing other than the child's possible retardation was called to the attention of the doctor. Dr. Luke testified that Jacqueline Rupp never informed him of the digestive difficulties that Billy was having. The condition of the child at the time of his death, coupled with Dr. Luke's testimony indicating a deterioration in Billy's health subsequent to the visit to his office, supply a basis for the jury to conclude that a need of further medical attention should have been obvious to both parents. In our view, it is not contrary to the law to expect, in certain circumstances, that persons charged with the duty to seek and provide medical care for a child should perceive an immediate need for such care even though a doctor has previously stated that the child should return for an evaluation at a future time which has not yet arrived. In this regard,

it is noteworthy that Jacqueline Rupp took another of her children to the doctor on April 17, 1975, just four days before Billy's death.

In support of his argument that there was insufficient evidence to support a conviction for failing to provide medical attention, Robert Rupp cites A.R.S. § 13–134, subparts 1 and 3, which read as follows:

The following persons shall not be punished for their acts or omissions:

1. Those who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

 \* \* \* \* \* \*

3. Those who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence.

Subpart 3 of the quoted statute is not here applicable inasmuch as no misfortune or accident appears to have been involved, and evidence indicating culpable negligence does appear. Appellant contends that his reliance upon Dr. Luke's advice to bring the child back in six months was a justifiable "mistake of fact" within the meaning of the statute, subpart 1. If all of the evidence indicated that all relevant conditions remained static, an analysis as to whether this direction could constitute a "mistake of fact" would be in order. However, there was evidence to the contrary and the statute does not relieve appellant of criminal liability under those circumstances.

## INSTRUCTIONS

Both appellants assert error in the giving or refusal to give certain jury instructions.

■ Both appellants contend that the court erred in refusing to give an instruction drawn largely from A.R.S. § 13–134, subparts 1 and 3, *supra*. While the jury was not instructed in the language of this statute, it was otherwise adequately instructed on what could and could not constitute negligence for which appellants might be held criminally responsible. Thus, there was no error in refusing to instruct in the language of the statute nor, for the same

reason, was there error in failing to give instructions offered by Jacqueline Rupp based in part upon the language of A.R.S. § 13–463.

■ Jacqueline Rupp asserts error in the failure to give her requested Instruction No. 13, which would have instructed the jury to relieve appellants of criminal liability if Billy's attending doctor committed malpractice sufficient to be a proximate cause of his death. *See State v. Ulin,* 113 Ariz. 141, 548 P.2d 19 (1976). Her requested instruction refers only to "willful" as opposed to negligent mistreatment by the doctor. The trial court adequately instructed the jury on the subject in an instruction that included a reference to negligent as well as willful mistreatment.

■ Jacqueline Rupp also presented an Instruction No. 18 which tended, in effect, to state that the medical aid that she was required to provide could be furnished by a practitioner of any recognized school of medicine. Appellant asserts in her brief that without this instruction, the jury might have held her responsible for the possible incompetence of Dr. Luke. However, there was no specific reference in the requested instruction to osteopathy or to Dr. Luke. No issue was raised in the trial court as to the qualifications of Dr. Luke as an appropriate practitioner for appellants to consult in regard to Billy. The refusal to give this instruction was accordingly not error.

■ The remaining errors asserted in behalf of Jacqueline Rupp are directed to the court's instructions on the misdemeanor violations to which reference was made earlier in this opinion. Similar instructions on violations of misdemeanors were approved in *State v. Swafford, supra.* However, appellant argues that these instructions were improper in light of the fact that they indicate that a "willful" act may be one unintentionally done. As appellant notes, A.R.S. § 13–801, one of the statutes in question, requires a willful failure to provide, while the instructions defined involuntary manslaughter as an unintentional act.

Because of these differing standards, appellant argues that the jury may have been confused into believing the *willful* act necessary under § 13–801 might be unintentionally done. The instructions given by the trial court, however, clearly distinguish between the basic charge of involuntary manslaughter and this specific misdemeanor offense. Taking the instructions given as a whole, we see no basis for believing that the jury might have been confused.

There was no error in respect to the instructions.

## CONDITION OF PROBATION

 Jacqueline Rupp was placed on probation. One of the conditions of the probation imposed by the court was that she submit to a search at any time by any police officer. Such a condition of probation has been approved by our Supreme Court. *See State v. Montgomery,* 115 Ariz. 583, 566 P.2d 1329 (1977). In approving such a condition, however, the Supreme Court stated:

> We agree that in a great majority of cases the trial court should not require, as a condition of probation, that the probationer submit to a search and seizure without warrant by any police officer in addition to the search and seizure without a warrant by a probation officer.

*Id.* at 585, 566 P.2d at 1331.

The record in regard to sentencing provides nothing that we can find to justify imposition of such a condition in the present case. The presentence report indicates that although she once smoked marijuana at a party, Jacqueline Rupp has never engaged in any criminal activity "nor does she appear to have a propensity toward criminal activity." We accordingly conclude that the condition at issue is inappropriate in this case.

## CONCLUSION

The convictions are affirmed. The sentences of probation imposed upon appellants are affirmed with the exception of the condition of probation imposed upon Jacqueline Rupp that she submit to a search without warrant by any police officer, which condition is vacated.

JACOBSON, P. J., and OGG, J., concur.