572 P.2d 439

**STATE of Arizona, Appellee,**

v.

**Daniel Lewis PURCELL, Appellant.**

No. 3595.

Supreme Court of Arizona,
En Banc.

Nov. 29, 1977.

Rehearing Denied Dec. 20, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer III and Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Stephen J. Rouff, Yuma, for appellant.

HAYS, Justice.

A jury found appellant guilty of first degree murder on June 24, 1976. He was sentenced to life imprisonment without possibility of parole for 25 years. Timely motions for a judgment of acquittal and for a new trial were filed and denied. A timely notice of appeal directly to the Supreme Court of Arizona was filed pursuant to A.R.S. § 13–1711.

Almost all the facts of this case came from appellant's statement to the police. This statement was read to the jury and indicates that on Saturday, January 3, 1976, the appellant, Daniel Lewis Purcell, came to Yuma, Arizona from New Mexico. He arrived without a job or place to stay and with very little money. He hoped to find work as a truck driver in the Yuma produce business.

Having no place to stay but in his vehicle, appellant spent the afternoon and evening of Saturday, January 3, 1976, in a bar in Yuma. Appellant first met the murder victim, Rowlett, at this bar late in the evening of January 3. Rowlett was known to be a homosexual who often picked up and propositioned young men in this bar and other Yuma bars. Appellant did not realize that Rowlett was a homosexual.

Rowlett invited appellant to come home with him and spend the night at his apartment. Appellant did not go to Rowlett's apartment the night of January 3.

On Sunday, January 4, 1976, appellant came to the same bar at approximately noon and remained there drinking beer until approximately 10:00 or 11:00 P.M. Appellant was again approached by Rowlett who bought appellant several beers and again invited appellant to spend the night in his apartment.

Appellant went home with Rowlett this night. Appellant stated to officers that shortly after they entered the apartment, Rowlett "grabbed" appellant's genitals. Appellant said that he was surprised, shocked and outraged by Rowlett's sexual interest in him. Appellant tried to leave the apartment but Rowlett blocked the door and continued "grabbing" appellant's sex organs.

Appellant hit Rowlett with his fist several times. Rowlett moved from the door to a couch; appellant hit him several more times. Appellant was very upset and shaking and he went to his car to calm down. He returned to the apartment with a loaded shotgun; the purpose for taking the gun is not clear.

Appellant told Rowlett never to come near him again and never again to go into the bar where they had met. Rowlett grabbed the barrel of the shotgun. Appellant jerked the gun away from Rowlett and hit Rowlett on the side of the head with the gun butt at least once and possibly three times. Then appellant put the barrel of the shotgun against Rowlett's chest, fired the gun, reloaded, again placed the barrel against Rowlett's chest, and shot him again. A medical doctor testified that Rowlett's death was caused by a gunshot wound which severed the aorta.

Appellant complains that misconduct of the prosecutor and "prejudicial events" prevented him from having a fair trial. We have carefully examined the entire record; we are convinced that appellant did receive a fair trial. Rather than unduly prolonging this opinion by setting forth all of appellant's many allegations of prejudice and prosecutorial misconduct, we will discuss only those claims which we believe have some merit. Even though we do not specifically mention every issue appellant raises, every issue has been fully examined and considered.

█ Appellant contends that the prosecutor committed reversible error in his final argument when he told the jury that the appellant could be released and might not be placed in a mental institution if they found him not guilty by reason of insanity. We have held that it is error for a prosecutor to initiate such an argument, *State v. Jordan,* 80 Ariz. 193, 294 P.2d 677 (1956), and it is also error to introduce testimony regarding the disposition of an insane defendant. *State v. Makal,* 104 Ariz. 476, 455 P.2d 450 (1969), *cert. denied,* 404 U.S. 838, 92 S.Ct. 128, 30 L.Ed.2d 71 (1971). However, both counsel discussed this matter in their closing arguments; the defense counsel being the first to mention that there would be a proceeding to determine what to do with defendant if he was found not guilty by reason of insanity. A defendant cannot benefit on appeal from an error he invited. *State v. Wilcynski,* 111 Ariz. 533, 534 P.2d 738, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975).

█ The trial judge ruled that the state could not play for the jury the tape recording of the defendant's statement to the police. Appellant argues that the prosecutor's reference to the taped statement in his closing argument violated the court's order and was reversible error.

A typed transcript of the tape recording had been read to the jury, and they were aware that the transcript had been prepared from the defendant's taped statement. In his closing argument, the prosecutor referred to some of the defendant's statements which had been read to the jury as being in the tape recording. Under the circumstances, we are unable to see that such comments violated the trial judge's order, or caused prejudicial speculation by the jury, as appellant alleges.

Appellant claims that the prosecutor engaged in misconduct when a state's witness testified erroneously regarding what day she had first noticed appellant in the bar where he met Rowlett. This witness stated that she had first seen appellant in the bar several days before the murder; however, the appellant maintained that he had first come to the bar the day before the murder. This discrepancy was material because if appellant had been frequenting the bar for several days before the murder, this would tend to discredit his story that he was surprised by Rowlett's homosexual behavior.

█ Although we agree with appellant that the prosecutor has a duty to check the veracity of his witnesses, *see United States v. Banks,* 383 F.Supp. 389 (W.D.S.D.1974) and *Prosecutor's Standard 5.6, Standards Relating to The Prosecution Function and the Defense Function,* American Bar Association (March, 1971), we do not feel that a prosecutor must ascertain the truthfulness of every detail of a witness' testimony, particularly not when, as in this case, the defense counsel could have interviewed the witness before trial, discovered when she recalled first seeing appellant in the bar, checked the accuracy of her recollection, and prepared to refute her testimony. Also, any prejudice to appellant was prevented by the defense's introducing a police teletype corroborating appellant's claim that he first came to Yuma the day before the murder.

Appellant also argues that the trial court erred in permitting the introduction of gruesome photographs of the murder victim. The photographs are unpleasant and probably did arouse the emotions of some jury members; however, we feel that the trial judge acted properly in admitting the three photographs. The record indicates that the judge selected these photographs from thirty-five originally offered by the state. The admitted photographs were carefully selected to assure that they were relevant and nonrepetitious. If several photographs adequately illustrated the same point, only the least gruesome was admitted.

█ The trial court has discretion in admitting or excluding photographs, and competent evidence will not be excluded just because it may arouse juror's emotions. *State v. Ferrari,* 112 Ariz. 324, 541 P.2d 921 (1975). When deciding whether evidence should be admitted, the court must weigh

the danger of prejudice to the accused against the probative value of the evidence. *State v. Beers,* 8 Ariz.App. 534, 448 P.2d 104 (1968). Gruesome photographs relevant to an issue in the case are admissible and may be received although they also might prejudice the jury against the defendant. A trial court's ruling on admissibility will not be disturbed unless an abuse of discretion appears. *State v. Mohr,* 106 Ariz. 402, 476 P.2d 857 (1970). *See also Miranda v. State,* 42 Ariz. 358, 26 P.2d 241 (1933).

In this case, the photographs were probative in several ways: they corroborated and explained testimony, *Ferrari, supra;* they aided the jury in understanding the circumstances of the crime, *State v. Robinson,* 89 Ariz. 224, 360 P.2d 474 (1961); such information could assist the jury in determining whether the killing was a manslaughter, first or second degree murder, or whether appellant might have been insane at the time of the killing.

During the trial, appellant, who was in custody, was led to the hall outside the courtroom in handcuffs. The handcuffs were removed before appellant was brought into the courtroom. However, on some occasions, jurors were in the corridor when appellant was being taken to court, and the jurors observed appellant in handcuffs accompanied by sheriff's deputies. Defense counsel stated to the court that he feared that his client had been prejudiced by the jurors' viewing him in these circumstances. The court noted that in Yuma this same method was used to transfer any defendant in custody to court and that appellant was not being treated as if he were especially dangerous.

The trial judge questioned the jury and ascertained that no juror felt he would be less impartial to appellant as a result of seeing him in handcuffs escorted by officers. The judge also instructed the jurors that it was the practice in Yuma to bring all jail prisoners to the court in this manner and that they were not to draw any inferences against appellant because they saw him handcuffed and followed by a deputy. Appellant seems to feel that the instruction

was an inadequate remedy. We believe that the trial court's admonition to the jury protected appellant from prejudice, and we hold that there was no error in the disposition of this matter at trial.

Appellant protests that Rowlett's son was called as a witness for the state only to arouse the jury's emotions and that, therefore, the use of this witness was reversible error. We disagree. Rowlett's son identified several items of his father's property which were either found in appellant's possession or traced to appellant. This is a proper use of a witness.

During closing argument, the prosecutor explained some aspects of the law of homicides incorrectly to the jury. Appellant alleges that the prosecutor's confusion denied him a fair trial. It is our opinion that any potential unfairness caused by the prosecutor's confusion was prevented by the prosecutor's telling the jury to follow the judge's instructions on the law rather than the prosecutor's interpretation of the law, an instruction from the court to the same effect, and proper instructions by the court on the law of homicide.

Appellant seems to suggest that the state used a mental health expert witness improperly. At the competency hearing, the expert, Dr. Cleary, testified:

"Q: Could you tell us what his state of mind was [at the time of the offense]?

"A: I don't have any idea what his state of mind was. I am not in a position where I can read his mind retrospectively."

Appellant apparently contends that Dr. Cleary could not form an opinion regarding appellant's sanity at the time he killed Rowlett unless Dr. Cleary knew what was going through appellant's mind during the offense. However, in his testimony the doctor pointed out that a finding of legal sanity does not require a finding of what was within the accused's mind at the time of the offense. Dr. Cleary explained, with the possible exception of intoxication, that he

could not find evidence that appellant had any mental problem that should impair his ability to think in a legally sane manner at the time of the murder. We see no incompatibility between these statements of Dr. Cleary and his statement that he could not read a mind retrospectively. Therefore, we find no impropriety in the state's calling Dr. Cleary as a witness.

During the trial a very serious problem arose regarding the transcript of the appellant's statement to police officers. The state had given defense counsel a typed transcript of appellant's taped statement several months before trial. There was nothing in this transcript to alert a diligent defense attorney to the possibility that the transcript might be incomplete or inaccurate. The defense counsel listened to the taped statement a few days before trial and noted that the typed and taped versions of the statement seemed substantially identical. Defense counsel had based his trial preparation and strategy upon this transcript.

Friday before the Tuesday on which trial began, the chief investigating officer and the prosecutor met in the prosecutor's office to review the tape and check the typed transcript for inaccuracies. The prosecutor and police officer made notations of additions and corrections on their copies of the transcript. Then a police stenographer retyped the transcript using both the annotated copies of the first transcript and the tape to try to achieve maximum accuracy. Apparently defense counsel first learned about the preparation of the second transcript accidentally during telephone conversations with the officer and prosecutor the weekend before trial.

On the first day of trial, the defense moved for a copy of the second transcript. Defense counsel received a copy the afternoon of the first day of trial; he did not have time to read it until that evening. Upon reading the second version, defense counsel discovered many differences between the first and second transcripts. In the second transcript, over four hundred more words were reported spoken by the appellant, and many additional words of the questioning officers were also indicated. Most important, additional words were included in the second version which suggested that appellant admitted premeditation. Defense counsel felt that there was no indication of premeditation in the first version of the transcript.

Upon discovering these discrepancies, defense counsel called the trial judge at home, and the judge arranged a late night meeting of the prosecutor, defense counsel, and the clerk of the court in the clerk's office for the purpose of listening to the tape. Because of the hour, only the portion of the tape suggesting premeditation was played, and this time the tape seemed to agree with the second transcript. Therefore, defense counsel suspected that the tape had been altered since he first listened to it.

The entire second day of the trial was consumed in an evidentiary hearing outside the presence of the jury to determine whether the tape might have been altered and why there was such a difference between the two transcripts. The part of the tape implying premeditation was repeatedly played in court, and all persons involved in taking the appellant's statement, handling the tape, and preparing the two transcripts were extensively examined and cross-examined. The hearing indicated that the tape probably had not been altered, and that the discrepancies resulted from some areas of the tape being very difficult to hear clearly. Even the prosecutor admitted that sometimes he could hear the crucial words suggesting premeditation and sometimes he couldn't.

After hearing lengthy testimony and many arguments from the state and the defense, the judge ruled that the state would be allowed to use only the first transcript and could not play the tape for the jury. These limitations were not imposed upon the defense.

Appellant takes the position that limiting the state to the use of only the first transcript was an inadequate remedy, and he raises many arguments in support of this position. We have reviewed all appellant's

arguments, and we are convinced that appellant's rights were fully protected by the trial court's ruling on the transcripts and tape.

We do not approve of the prosecutor's giving the defense such very late notice of inaccuracies in the transcript. This violates the spirit and letter of our criminal discovery rules which clearly require that unfair surprise should not occur. *See* 17 A.R.S. Rules of Criminal Procedure, rule 15. We find that any prejudice to the appellant due to this surprise was prevented by the trial court's ruling that the state might use only the first transcript.

 Appellant contends that the trial court erred in refusing to give requested defense instructions on premeditation and intoxication. The court gave the standard Arizona recommended instruction on premeditation, R.A.J.I., Crimes 4, Murder. The court's instruction on intoxication was an exact quotation of A.R.S. § 13–132, the statute setting forth the effect of intoxication on criminal liability. Both of these instructions are correct statements of the law and therefore we find no error. We note that this trial occurred before the effective date of the new Arizona Criminal Code scheduled to go into effect October 1, 1978.

 Appellant charges that there was insufficient evidence to support the jury verdict of guilty of first degree murder. An appellate court's standard for determining whether evidence is sufficient to justify a verdict must be to inquire whether there was substantial evidence in support of the verdict. *State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976). In reviewing the sufficiency of evidence the appellate court should interpret the evidence in a way most favorable to sustaining the verdict, and should resolve all conflicting inferences in a manner which supports the verdict. *State v. Verdugo*, 109 Ariz. 391, 510 P.2d 37 (1973).

 Applying these standards, we find that there was adequate evidence to justify the jury in deciding that appellant committed first degree murder:

1. Appellant left the apartment and went to his car.
2. He stayed in his car at least a few minutes.
3. He loaded the shotgun.
4. He returned to Rowlett's apartment.
5. He put the barrel of the gun against Rowlett's chest and shot him.
6. He ejected the spent shell, reloaded the gun, again pressed the barrel to Rowlett's chest, and shot again.

Having reviewed the entire record and finding no reversible error, the judgment of conviction and the sentence are affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.