969 P.2d 1184

**The STATE of Arizona, Appellee.**

v.

**Alex Vidal HUGHES, Appellant.**

**No. CR–97–0238–PR.**

Supreme Court of Arizona,
En Banc.

Nov. 19, 1998.

Susan A. Kettlewell, Pima County Public Defender By Brian X. Metcalf, Assistant Public Defender, Tucson, Attorneys for Appellant.

Grant Woods, Attorney General By Paul J. McMurdie, Chief Counsel Criminal Appeals Section and By Kent E. Cattani, Assistant Attorney General, Phoenix, Attorneys for Appellee.

## OPINION

NOYES, Judge.*

¶1 The jury rejected Defendant's insanity defense and convicted him of murder and other felonies. We reverse and remand because the cumulative effect of the prosecutor's misconduct deprived Defendant of a fair trial.

### Crimes

¶2 On August 25, 1991, Defendant, who had been drinking, argued with his sister's boyfriend and said he would shoot him. Defendant then went to his car, got a shotgun, chambered a shell, returned, and shot and killed the boyfriend. Defendant drove away,

---

* Justice James Moeller did not participate in the determination of this matter; pursuant to Ariz. Const. art. VI, § 3, the Honorable E.G. Noyes, Jr., Vice Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in his stead.

and then came back a while later, after police had arrived. When Defendant saw the police, he did a U-turn and sped away. During the ensuing high-speed chase, Defendant fired shots at officers and others, and he collided with a police car before surrendering. These events gave rise to the thirteen charges on which Defendant was convicted. There was little doubt that Defendant had done what he was charged with doing; from day one in this case, the serious issues related to Defendant's state of mind and his mental health.

## Lawyers

¶ 3   At all relevant times, the State was represented by Mr. Thomas J. Zawada of the Pima County Attorney's Office, and Defendant was represented by Mr. Creighton W. Cornell of the Pima County Public Defender's Office. We granted review on prosecutorial misconduct issues only. The main theme of Mr. Zawada's misconduct was repeated, groundless assertions and insinuations that defense counsel and expert witnesses were fabricating an insanity defense.

## Mental Illness

¶ 4   As the prosecutor told the jury in opening statement, the State's theory of the case was this: "Alex is nothin' but a mean drunk, ... there is no insanity in this case, and ... there is no mental illness in this case." When the prosecutor said there was no mental illness in the case, he knew that every one of the six mental health experts who examined Defendant between arrest and trial found him to be mentally ill. When the prosecutor said there was no insanity in the case, he knew that Defendant would present expert testimony that he was insane, and the State would present no expert testimony that Defendant was sane.

¶ 5   From the beginning, the State knew about the mental health issues in this case. Immediately after the shooting, Defendant's sister (the murder victim's girlfriend) told police that Defendant was mentally ill, that he would talk "off the wall" to the television and radio, that he believed doctors had implanted a monitoring device in his body, and that a doctor had said there was "something mentally wrong" with him. When Defendant was interrogated after his arrest, officers called in Dr. Kevin Gilmartin (at midnight on a Sunday) because he had given them some training in asking questions to rebut an insanity defense, and the officers wanted the doctor there to "review [Defendant's] capabilities" and to ask any questions the doctor wanted to ask. (The doctor did not testify at trial or in pretrial hearings.)

¶ 6   When police interviewed Defendant's mother and brother a few days after his arrest, they said he was mentally ill and that the family had tried to get help for him. The mother said that Defendant's personality changed regardless of whether he had been drinking. The brother said that Defendant "always had a problem ... mentally. Always ... heard the TV, always heard the radio ... he was what they identify as one of those schizophrenic like that."

¶ 7   After Defendant was indicted, defense counsel notified the State that the defenses would include insanity and self-defense and that the witnesses would include anyone who could testify to Defendant's paranoid schizophrenic behavior.[1]

## Pretrial Incompetence

¶ 8   In January 1992, Dr. Larry Morris, a clinical psychologist, evaluated Defendant and concluded that he was "a seriously dysfunctional 36–year–old man who appears to

---

1.  For some sort of tactical reason, Defendant withdrew the insanity defense in January 1993, then realleged it in April 1993. Also, until late in the trial, Defendant raised only self-defense to the murder charge. But the State knew that Defendant would eventually move to raise the insanity defense to the murder charge. When Defendant made such a motion, the prosecutor stated, "Well, quite frankly, it's been my position all along that the defendant was going to do it, de facto, whether or not he was going to claim it,

and I, as the Court, believe that he's already done it...." But the prosecutor objected to the motion, stating, in part, "[H]ad the situation become more apparent to me, I may have sought assistance of some type of psychiatric expert." In overruling the objection and allowing Defendant to raise the insanity defense to all charges, the court noted that the prosecutor had "already acknowledged the defendant ... raised the issue of insanity as much for the murder charge as ... for the other charges."

be suffering from a psychotic disorder. His clinical presentation suggests Schizophrenia, Paranoid Type, Chronic. In my opinion a formal Rule 11 evaluation and determination is warranted in this case." Defense counsel requested a competency determination pursuant to Rule 11, Arizona Rules of Criminal Procedure. The prosecutor accused Defendant of faking symptoms after being "primed" by the doctor. The court ordered a Rule 11 examination.

¶ 9 The State refused to nominate a mental health expert. The court then ordered an evaluation by the Court Clinic, which assigned the matter to Dr. Todd Flynn, a clinical psychologist. Dr. Flynn's March 26, 1992, report concluded, "[T]here is sufficient cause to believe that Mr. Hughes suffers from a Paranoid–Delusional Disorder or chronic Paranoid–Schizophrenia which includes grandiose delusions which might significantly detract from his ability to cooperate with counsel and meaningfully participate in a jury trial or other legal proceeding."

¶ 10 In April 1992, on the basis of reports from Dr. Morris and Dr. Flynn, the court found Defendant incompetent to stand trial and ordered him committed until his competency was restored. In July 1992, Dr. Jack Potts, Associate Medical Director of Psychiatric Services of the Maricopa County Department of Health Services, wrote to the court that Defendant was now competent. Dr. Potts also wrote, "[I]f at the time of the alleged offense [Defendant] was similarly paranoid as he was when he presented to us there may be an issue as to his intention and/or criminal culpability." The court found Defendant competent to stand trial.

¶ 11 In October 1992, defense counsel requested another evaluation based on his own belief that Defendant had degenerated and was no longer competent. The court ordered an evaluation. At a February 5, 1993, hearing, Defendant called three expert witnesses and the State called no witnesses. Dr. Potts testified that Defendant's mental condition had deteriorated because he was back in the Pima County Jail and was not receiving Navane. On questioning from the court, Dr. Potts said that Defendant should receive five milligrams a day of Navane or similar medi-

cation. Dr. Flynn testified that Defendant had delusions of persecution that included Dr. Flynn, the prosecutor, and defense counsel, who Defendant believed was part of the prosecutorial system. Dr. Flynn testified that Defendant's mental illness was chronic, it was "not something that just popped up yesterday or last week or last month," and it provided "reasonable grounds to question [Defendant's] ability to cooperate with counsel in formulating a defense and in participating in a trial." Dr. Morris testified that Defendant was a paranoid schizophrenic who, without medication, had regressed to the point of present incompetence.

¶ 12 The court made no finding of incompetence, but it ordered the Medical Director of the Pima County Jail to evaluate Defendant "for the administration of Navane at a dosage of five milligrams per day," and it ordered that the jail notify the court if it was unable or unwilling to so medicate Defendant.

¶ 13 On March 26, 1993, Dr. Catherine Boyer, a clinical psychologist at the Court Clinic, became the fourth expert to testify that Defendant was presently incompetent. She said that Defendant believed he could hear people's thoughts and he was very suspicious of defense counsel. She saw no evidence of malingering; to the contrary, she thought that Defendant "seemed very intent on showing that he was not mentally ill and that he was able to proceed with his case." The State called no witnesses.

### Finding of Competence Reversed

¶ 14 The trial court rejected the undisputed evidence and found that Defendant was competent. The order provided, in part,

While the defendant may appear to have some signs of mental illness, his behavior in relation to defense counsel is not uncommon among defendants, in general, and with defense attorneys who have personality traits similar to lead defense counsel's.

. . . .

Much of the defendant's conduct amounts to malingering. The Court finds the defendant is competent to stand trial.

¶ 15 Defendant filed a petition for special action in Division Two of the Court of Appeals.[2] On May 12, 1993, the court of appeals vacated the trial court's finding of competence because

The record before us contains no reasonable evidence to support the trial court's conclusion that [Defendant] was competent when the various experts last examined him. We recognize that in evaluating the evidence the trial court is not bound by the opinions of experts. However, there must be some basis for rejecting the testimony of experts, such as observations made by the court of the defendant or, perhaps, testimony of counsel. Here, the experts, including psychologist Catherine Boyer who testified on behalf of the court clinic, unanimously concluded that petitioner was unable to assist his counsel because of his paranoia. We can find no reasonable evidence to support a rejection of the opinions of four experts, the only experts who testified. There is no reasonable evidence to support the court's finding that petitioner is malingering. That defense counsel may have violated the court's orders in this matter or acted in an inappropriate, perhaps unethical manner, is not relevant to a determination under Rule 11.

(Citations omitted.) The court of appeals also noted that the State's response to the petition for special action "does not dispute petitioner's contention that the evidence unequivocally established petitioner's incompetency when last examined."

¶ 16 On remand, the trial court committed Defendant to the Maricopa County Department of Health Services to be restored to competence. The court also ruled that, at trial, each side would be limited to one expert witness on the issue of sanity. In moving for

reconsideration of this ruling, defense counsel argued,

The need for more than one expert is especially true given the prosecution's apparent tactic. The prosecution will not retain, or call an expert, to contradict Dr. Potts. Rather, the prosecution will "bash" psychiatry and psychology as not being a science, and as not being reliable evidence upon which to base an acquittal or a conviction for a lesser offense.

The trial court denied the motion, but later ordered that Defendant could call two experts, namely, "one mental health expert to testify about those matters involving psychiatric, psychological and malingering issues" and "a medical expert on physical trauma as it relates in general to organic brain disorders." The propriety of this order is not before us.

### Competence Restored

¶ 17 About a year later, by letter dated April 18, 1994, Dr. Potts advised the court that Defendant was presently competent, although in need of continued medication and psychiatric treatment. In response to the letter from Dr. Potts, defense counsel requested a competency hearing and nominated Dr. Boyer to evaluate Defendant. The prosecutor again refused to nominate a mental health expert. At the hearing, the prosecutor called six Pima County employees who had contact with Defendant after his arrest. These witnesses were a jail librarian, a sheriff's office clerk, three sheriff's office correctional specialists, and a superior court release specialist. In general, these witnesses testified that Defendant seemed fine to them, he exhibited no bizarre behavior, he made routine purchases, and he reviewed legal materials in the jail in September 1991.

---

2.  Defense counsel also accused the trial court of bias and prejudice, and asked for a new judge. This motion was denied by the superior court presiding judge. Defense counsel was quite an accuser in this case. The trial court once wrote, "Defendant's motion practice continues to make scurrilous attacks upon State's counsel.... Counsel's motion practice does not merit this much judicial consideration but for its outrageous nature."

Although not all of defense counsel's accusations were unfounded, to fairly discuss how often

the court and/or the prosecutor had reason to believe that defense counsel was himself guilty of impropriety would be a long story that will not be told in this opinion. Defense counsel misconduct can be the focus of other proceedings, but it warrants only a footnote in this opinion, which is focused on whether prosecutorial misconduct deprived Defendant of a fair trial. It suffices to say that the State does not argue, and we do not find, that the prosecutorial misconduct in this case can be excused on any sort of "invited error" theory.

¶ 18 On June 29, 1994, Defendant took the stand. He wanted to testify, he said, "[t]o prove that I am competent." He said he was prepared to go to trial next week, he was not mentally ill, and he had never been mentally ill. When asked if he was schizophrenic, Defendant said, "Not personally, no." When Defendant stepped down, the court ordered that he continue to receive medication, and the court found that "defendant's own testimony removed any doubt in the Court's mind about his competency. Defendant did an excellent job of representing himself, did an excellent job of responding to questions. Finding of the court the Defendant is competent."

## Mistrial and Retrial

¶ 19 Trial began on July 6, 1994, but the court declared a mistrial on July 20, after a State's witness gave a non-responsive answer that included some information that the prosecutor had been ordered not to disclose to the jury. After defense counsel argued that Mr. Zawada had intentionally risked a mistrial to disclose this information to the jury, the court found that "the prosecution in this case has not in any way intentionally caused the result which leads to this mistrial." The court also stated, "It is the further order of the court that a mistrial is appropriate in view of the ribbons that were worn to court by some of the witnesses."

¶ 20 Retrial began on July 21. During voir dire, the court asked the jury panel, "Is there anyone here who feels that, uh—for any reason, that psychiatrists or psychiatry is not a—field, uh, that should be permitted in a court of law? Anybody here who believes that they have any bias or prejudices towards psychiatry, the field of psychiatry?" No juror responded to either question, but the prosecutor did. He moved for a mistrial. After approaching the bench and making the motion, Mr. Zawada stated, "I know that the legal system—a lot of people in the legal system think that these people have something to add to what's going on; I don't, and I think, here, those questions—and I—and I see—see it as the legal system being supportive of psychiatrists and psychologists."

The court did not bother to rule on this patently frivolous motion.

¶ 21 To avoid redundancy, we discuss the trial evidence and the prosecutorial misconduct in later sections of the opinion.

¶ 22 The jury found Defendant guilty of first degree murder, attempted second degree murder, aggravated assault (eight counts), disorderly conduct (two counts), and felony fleeing. Defendant was sentenced to life in prison on the murder charge and a total of 184.25 years on the other charges. After calculating consecutive and concurrent terms, the total sentence was life plus 100 years.

¶ 23 Defendant's appeal argued for reversal on eleven grounds. In a memorandum decision, the court of appeals reversed one of the aggravated assault convictions and affirmed all other convictions. *State v. Hughes*, No. 2 CA–CR 94–0636 (Ariz.Ct.App. Dec. 24, 1996). We granted review "as to those issues dealing with prosecutorial misconduct." We have jurisdiction pursuant to Arizona Constitution, article 6, section 5(3), and Arizona Revised Statutes Annotated ("A.R.S.") section 13–4031 (1989).

## The Cumulative Error Doctrine

¶ 24 Defendant argues that the prosecutor improperly asserted and insinuated that Defendant, defense counsel, and expert witnesses fabricated an insanity defense, improperly drew the jury's attention to Defendant's failure to testify, and improperly warned the jury to consider how they would feel if they found Defendant not guilty by reason of insanity and someone else was murdered in the future. Defendant alleges that this prosecutorial misconduct, individually and cumulatively, denied him a fair trial.

¶ 25 At the outset, we need to clarify Arizona's position regarding the cumulative error doctrine in criminal cases. Our general rule has been stated several times over the years, and was recently stated in *State v. Dickens*, 187 Ariz. 1, 21, 926 P.2d 468, 488 (1996), as follows: "[T]his court does not recognize the so-called cumulative error doctrine." *See also State v. Roscoe*, 184 Ariz. 484, 497, 910 P.2d 635, 648 (1996); *State v.*

*White,* 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991). This lack of recognition is based on the theory that "something that is not prejudicial error in and of itself does not become such error when coupled with something else that is not prejudicial error." *Roscoe,* 184 Ariz. at 497, 910 P.2d at 648. In *Roscoe,* for example, each alleged error was either "no error at all or no prejudice to Roscoe." *Id.* We reiterate the general rule that several non-errors and harmless errors cannot add up to one reversible error. We also clarify the fact that this general rule does not apply when the court is evaluating a claim that prosecutorial misconduct deprived defendant of a fair trial.

### Prosecutorial Misconduct

■■■■■ ¶ 26 To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Atwood,* 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992) (quoting *United States v. Weinstein,* 762 F.2d 1522, 1542 (11th Cir. 1985) (quoting *United States v. Blevins,* 555 F.2d 1236, 1240 (5th Cir.1977))); *see also State v. Lee,* 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997). To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct.

¶ 27 That Arizona recognizes the cumulative effect of prosecutorial misconduct is shown by the following passages from some Arizona cases (with our emphasis supplied):

Any one of the improper statements taken alone might not have warranted a mistrial, but the cumulative effect was highly prejudicial with a strong probability that the statements influenced the jury verdict.

*State v. Woodward,* 21 Ariz.App. 133, 135, 516 P.2d 589, 591 (1973).

We believe that while any one of the improper statements taken alone might not warrant a mistrial, **the cumulative effect** of the argument was prejudicial and mandates a reversal.

*State v. Filipov,* 118 Ariz. 319, 323, 576 P.2d 507, 511 (App.1977).

Although the one question and answer standing alone without objection and without further elaborating questions might not be prejudicial, we believe that **the question together with the comments thereon to the jury** was fundamental error. . . .

*State v. Anderson,* 110 Ariz. 238, 241, 517 P.2d 508, 511 (1973).

From the record we have before us, we believe that the remarks of the county attorney were unsupported and **when considered with the other examples of misconduct,** constituted reversible error. A new trial should be granted.

*State v. Bailey,* 132 Ariz. 472, 479, 647 P.2d 170, 175 (1982).

The problem here is not some isolated result of loss of temper, but **the cumulative effect** of a line of questioning in which the prosecutor posed numerous improper questions resulting in at least two bench conferences and one court admonishment.

*Pool v. Superior Ct.,* 139 Ariz. 98, 106, 677 P.2d 261, 269 (1984).

After the jury began its deliberations, defense counsel moved for a mistrial based on **the cumulative effect** of the foregoing statements. . . .

. . . .

. . . This misconduct was particularly egregious considering that the court had earlier excluded statements regarding a prior incident because they had not been formally disclosed in advance of trial.

*State v. Leon,* 190 Ariz. 159, 161–62, 945 P.2d 1290, 1292–93 (1997).

### *Dickens* and *Duzan*

¶ 28 Unfortunately, two recent cases refused to recognize the cumulative error doctrine while denying a claim of prosecutorial misconduct. *See State v. Dickens,* 187 Ariz. at 21, 926 P.2d at 488; *State v. Duzan,* 176

Ariz. 463, 466, 862 P.2d 223, 226 (App.1993). The result was plainly correct in each case, but the analysis was partly incorrect because we *do* recognize the cumulative effect of prosecutorial misconduct. Perhaps the general rule was misapplied in *Dickens* and *Duzan* because neither appeal raised a strong "permeates the atmosphere" claim. The appeal in *Dickens* complained of seven instances of prosecutorial misconduct, but objection to six of them was waived by failure to object at trial. *Id.* at 20, 926 P.2d at 487. We found no error in the claim that was preserved and no fundamental error in those that were waived. *See id.* at 21, 926 P.2d at 488.

¶ 29   In *Duzan,* the court stated, "We note preliminarily that the doctrine of cumulative error is not recognized in Arizona … absent related errors." *Id.* at 466, 862 P.2d at 226 (citations omitted). Although multiple instances of prosecutorial misconduct are, in fact, related errors in a "permeates the atmosphere" claim, the *Duzan* defendant had a very weak claim in that regard; he alleged three instances of misconduct on appeal, but two of them were waived and were not fundamental error, and the third was not error at all. *See id.* at 466–68, 862 P.2d at 226–28.

¶ 30   *State v. Floyd,* 120 Ariz. 358, 586 P.2d 203 (App.1978), involved a prosecutorial misconduct claim that was as weak as those in *Dickens* and *Duzan,* but *Floyd* implicitly recognized the cumulative error doctrine while denying the claim, as follows:

> Ultimately, citing *State v. Filipov,* 118 Ariz. 319, 576 P.2d 507 (App.1978), and *State v. Woodward,* 21 Ariz.App. 133, 516 P.2d 589 (1973), appellant urges that the cumulative effect of the prosecutor's statements requires reversal if the statements individually do not. We find no impropriety approaching the level in the cited cases.

*Id.* at 362, 586 P.2d at 207. The level of prosecutorial impropriety in *Dickens* and *Duzan* was similar to that in *Floyd* and warranted the same result, but the *Floyd* analysis was more precise.

### Pool

¶ 31   The level of impropriety by prosecutor Zawada in this case approximates that seen in *Pool.* There, the issue was whether the double jeopardy clause barred retrial after a mistrial had been declared because of pervasive misconduct by prosecutor Thomas J. Zawada (the same). *See Pool,* 139 Ariz. at 100, 677 P.2d at 263. In deciding that retrial was barred, we considered the cumulative effect of the prosecutor's misconduct, we cited many examples of it, and we concluded that "portions of the questioning are so egregiously improper that we are compelled to conclude that the prosecutor intentionally engaged in conduct which he knew to be improper, that he did so with indifference, if not a specific intent, to prejudice the defendant." *Id.* at 109, 677 P.2d at 272. We have the same opinion regarding Mr. Zawada's conduct and state of mind here. (Because Defendant was convicted and is seeking a new trial, the double jeopardy clause is not an issue in this case.)

¶ 32   In reviewing prosecutorial misconduct, we focus on whether it affected the proceedings in such a way as to deny the defendant a fair trial. *See State v. Atwood,* 171 Ariz. 576, 607, 832 P.2d 593, 624 (1992). "We are not eager to reverse a conviction on grounds of prosecutorial misconduct as a method to deter such future conduct." *State v. Towery,* 186 Ariz. 168, 185, 920 P.2d 290, 307 (1996). Prosecutorial misconduct is harmless error if we can find beyond a reasonable doubt that it did not contribute to or affect the verdict. *See id.; State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).

¶ 33   The prosecutor has an obligation to seek justice, not merely a conviction, and must refrain from using improper methods to obtain a conviction. *See Bible,* 175 Ariz. at 600, 858 P.2d at 1203; *Pool,* 139 Ariz. at 103, 677 P.2d at 266. "We emphasize that the responsibilities of a prosecutor go beyond the duty to convict defendants. Pursuant to its role of 'minister of justice,' the prosecution has a duty to see that defendants receive a fair trial. Ariz. R. Sup.Ct. 42, E.R. 3.8, comment; *State v. Cornell,* 179 Ariz. 314, 331, 878 P.2d 1352, 1369 (1994)." *State v. Rodriguez,* 192 Ariz. 58, 64, 961 P.2d 1006, 1012 (1998).

## The Evidence

¶ 34    As previously stated, there was never much doubt that Defendant had done what he was charged with doing. Our discussion of the evidence focuses on prosecutorial misconduct in relation to the insanity defense. Most of that misconduct was committed in cross-examination of Dr. Potts and in rebuttal argument.

¶ 35    The State's first witness was Defendant's sister. Her recently written statement differed in some respects from what she told police after the shooting. In questioning these discrepancies, the prosecutor asked her a question that was loaded with unfounded insinuations about defense counsel:

When Mr. Cornell demanded that you write this letter, did he indicate to you that you were supposed to say something about everybody else being drunk, or starting to drink around 12:00 that day? Were you supposed to explain and create the impression that everybody else was drunk on this day?

Mr. Cornell objected and the trial court told Mr. Zawada to rephrase the question.

¶ 36    The State spent the next five days of trial proving the crimes. Witnesses included a medical examiner, four members of Defendant's family, six members of the victim's family, and more than twenty law enforcement officers. The prosecutor's questions of the family were intended to show that Defendant was intelligent, athletic, and competitive, could function in society, could become abusive and out of control when drunk, and so forth. Defense counsel's questions of the family were intended to show that Defendant was mentally ill, would ask that the television be turned off so the government could not hear him, would not get a tooth pulled because he was afraid the dentist "would put in something for the government or the police or something," and so forth.

¶ 37    As per court order, Defendant called only two experts on the insanity defense. Dr. Andrew Belan, a psychologist who did "brain mapping," testified that Defendant's brain wave activity was like that of people with chronic schizophrenia, that Defendant's

test results were not consistent with any other condition, and that his condition was not caused by long-term alcohol abuse. Mr. Zawada asked nothing remarkably improper of Dr. Belan.

¶ 38    Dr. Potts was the only defense expert the trial court allowed to give an opinion on insanity; Dr. Potts was therefore the major witness on Defendant's primary defense, the insanity defense. Dr. Potts testified that he was board certified by the American Board of Psychiatry and Neurology, he was Chief of Forensic Psychiatry for Maricopa County Correctional Health Services, and he had been working in the Maricopa County Jail as a forensic psychiatrist since 1981. He had done hundreds of insanity evaluations on inmates over the years. He had testified on insanity in about ten trials; in most of those trials, he was called to testify by the State.

¶ 39    Dr. Potts testified that he and his colleagues were concerned about possible malingering when Defendant first came into their care because the charges were serious and Defendant had no known history of institutionalization. However, after evaluating Defendant continuously on a 24–hour–a–day basis for some time, they concluded that he was not malingering. Dr. Potts noted that Dr. Osran, who treated Defendant in mid–1993, and Dr. Boyer, who treated him in May 1993, also concluded that he was not malingering. Dr. Potts testified that Defendant's "overwhelmingly positive" reaction to antipsychotic medication confirmed the diagnosis of schizophrenia because "[o]ne cannot feign the response to the medication." Dr. Potts said that his opinion was consistent with that of Dr. Flynn; they both noted that Defendant hallucinated and was extremely defensive about being viewed as mentally ill, symptoms that are characteristic of mental illness.

¶ 40    Dr. Potts testified that when, in his July 1992 report, he raised an issue about Defendant's sanity at the time of the crimes, he had not been contacted by any attorney in the case. After he was retained by defense counsel in late 1992, Dr. Potts reviewed many documents, including medical reports, and statements from witnesses, police, and family. Dr. Potts testified that, in his opin-

ion, Defendant "unquestionably suffers from schizophrenia of a paranoid type," that because of this condition Defendant did not know that what he was doing on August 25, 1991, was wrong, and that he met the M'Naghten standard of insanity.

¶ 41 Dr. Potts testified that Defendant had been "extremely consistent" over the years when describing the crimes. In brief, Defendant's perception was that the victim was tougher than he was, and when they argued on August 25, 1991, Defendant became afraid that the victim would hit him in the jaw. Defendant thought that "a blow to his jaw might kill him." Defendant got the shotgun, the victim continued to taunt him, and the gun fired. Realizing what he had done, Defendant drove out to the desert to kill himself. After thinking about that for a while, Defendant decided that he had done nothing wrong, so he drove back to the house to see if the victim was all right. When he saw the police and heard one of them say "machine gun" in Spanish, Defendant again became afraid for his life, made a U-turn, and sped away, with police chasing him.

### Misconduct in Cross–Examination

¶ 42 The prosecutor asked Dr. Potts if he had spoken to any defense witnesses or knew what the defense investigator had said to them. Dr. Potts answered, "No." The prosecutor then asked, "Do you know whether or not [the investigator] went out there and told him, hey, listen, we are trying to build an insanity defense, can you think of anything, ever, in the defendant's life that maybe you thought was a little strange or weird or odd?" Dr. Potts responded, "That would be pure conjecture, Mr. Zawada." On two occasions, Mr. Zawada asked questions that put before the jury information that earlier evaluations of Defendant were done after contact with the court system. The trial court had expressly precluded this information. Counsel's objections were sustained.

¶ 43 Referring to Dr. Morris's opinion that he could not evaluate Defendant's state of mind because Defendant would not provide enough information, the prosecutor asked Dr. Potts, "So when does the issue of

insanity arise in this case?" The court sustained the objection.

¶ 44 One question to Dr. Potts was an improper rhetorical argument: "I mean, you pick up Mr. Hughes as a—as a client for the court, initially, and you are not able to make any decision, and then what happens is after you are hired by the defense, you are able to come to a conclusion?" The objection was sustained.

¶ 45 The prosecutor ended one argument with Dr. Potts by blurting, "Do you know that this Court found this defendant competent?" The court called counsel to the bench and said that competency was not an issue at this time. The prosecutor replied, "I don't think the competency ever was an issue, quite frankly." After denying Mr. Cornell's motion for a mistrial, the court instructed the jury that competency was not an issue and they were not to consider that issue or be concerned about it.

¶ 46 The defense called nine other witnesses for brief testimony. An officer testified that, prior to Defendant's arrest, another officer radioed that Defendant had a "possible past psych history" and that "it would be something that we would have to deal with" after Defendant was arrested. A neighbor testified to strange behavior by Defendant. A jail records custodian testified that Defendant's sister was not one of his visitors after his arrest. Two public defenders testified that they did not give Defendant any police reports after his arrest. Four witnesses testified on various other matters. Defendant did not testify.

### The State's Rebuttal Evidence

¶ 47 In rebuttal, the State called the arresting officer and four County employees who had contact with Defendant after his arrest. These witnesses noticed nothing strange about Defendant, although the intake specialist did refer him for a mental health interview after he said he was hearing voices. The arresting officer thought that Defendant was intoxicated but not drunk. The jail librarian testified that, on September 11, 1991, Defendant asked for the Arizona criminal code and materials on murder, aggravated assault, and endangerment. The

State did not call a mental health expert. The State's rebuttal evidence was as ineffective as that in *State v. Overton*, 114 Ariz. 553, 562 P.2d 726 (1977), where, "[t]o establish sanity, the State introduced the testimony of police officers who based their opinions on observations and interrogations *after* the commission of the crime." *Id.* at 556, 562 P.2d at 729. We held that such testimony was not competent to rebut evidence of insanity because,

> if the State relies on lay testimony to establish sanity, there must have existed an intimacy between the witness and the defendant of such a character and duration that the witness' testimony is of probative value to establish that defendant knew the nature and quality of his act and that he knew it was wrong.

That Defendant was talking normally after he was in custody "does not negate the more subtle and insidious forms of insanity with which the mind may be possessed." *Id.* To be competent to offer an opinion on sanity, "a lay witness must have had an opportunity to observe the past conduct and history of a defendant." *State v. Zmich*, 160 Ariz. 108, 111, 770 P.2d 776, 779 (1989). None of the State's rebuttal witnesses met that foundational requirement. (Some of the witnesses in the State's case-in-chief did meet it.)

### Misconduct in Rebuttal Argument

■ ¶ 48 After both sides rested, the court advised counsel that the procedure for objecting during final argument was "to simply state objection, reserve the matter, and let it go. Then after the jury is gone, the record is made." The State's opening argument and Defendant's final argument contained no remarkable impropriety.

¶ 49 The stage was set for the prosecutor's rebuttal argument. The prelude took place outside the jury's presence:

> MR. CORNELL: One final thing and it's this, Judge. I tried to comport myself within the rules of this Court and the rules of the lawyers during my argument. If there's anyone, by reputation, that's known to step on the Constitution in rebuttal argument, it's Mr. Zawada. I move the Court to carefully listen to him because

I'm very concerned. This is now the scariest part of the trial other than Alex having to testify, Mr. Zawada on rebuttal. Please try and control him.

> MR. ZAWADA: Can the record reflect that I thought he was just going to jump over Detective O'Connor into my lap? He pointed his finger at me.

> THE COURT: Could I have the verdict forms?

> MR. ZAWADA: This has been going on throughout the entire trial.

> MR. CORNELL: This is our copy to look at. Mr. Zawada's wife is also fearing for his safety from me as well.

> MR. ZAWADA: And again, another gratuitous look at me, and a third.

> THE COURT: Okay.

> MR. CORNELL: It's rare that I get to see a sandbagger in such rare form, Judge.

> THE COURT: Well, Thomas S. Murphy, the Federal District Court Judge in the Second District of California, often remarked, counsel, let's try and make this look like a lawsuit, and it needs no response.

¶ 50 Mr. Zawada then delivered a rebuttal argument that covers about forty pages of transcript and is a masterpiece of misconduct. It contained proper argument, too. Early on, Mr. Zawada argued that the jury should look at Defendant's actions "[s]hortly before, during, and shortly after the commission of the offense" because,

> if you go like three days later, four days later, a month later ... they have had the opportunity to digest the criminal statutes, the case law, ... they've had the opportunity to sit around with the other inmates in the county jail, ... they have had the opportunity to think and reflect upon what they've done, ... they've had the opportunity to discuss matters with their sister or mother and everybody else involved in the case, and then they've decided to try to put a story together, if you don't look at people's actions at the relevant times, nobody would ever be convicted of anything.

The record contained facts from which the State could fairly make a "fabrication" argument about Defendant and his family. For

example, his sister did change her testimony, the change did favor Defendant, and Defendant did seem to know about this change before anyone else did.

¶ 51 Then the prosecutor went out of bounds, and outside the record, to argue that psychiatrists create excuses for criminals:

How about the Judge back there in New York, was it, that was infatuated with the secretary or somebody else and he followed her around and sent her notes and sent her letters and all kinds of things and wouldn't leave her alone. I don't know if he stalked her or not, and ultimately they looked into the case a little bit. You know what they did, they created a syndrome for him to try to justify his action.

¶ 52 Then the prosecutor, with no evidentiary support, argued that defense counsel paid Dr. Belan to fabricate a diagnosis:

[Dr. Belan] knows the result he's looking for, and that's it. He knows the result he is looking for. Subject comes in with schizophrenic—potential schizophrenic diagnosis. He knows right there what he is looking for, and $950 later, yes, that's what he's got. . . .

. . . He knows the result for he knows the result he wants.

. . . .

I mean he didn't see him, ladies and gentlemen, this defendant didn't walk off the street and say I am not feeling well, I have had this headache, I have got something wrong. I mean he comes to him in the most suspicious circumstances that you can ever have. He gets referred by his attorney. Just like he was in December of '91 for a psychiatric evaluation. Reportedly suffering from schizophrenia, and lo and behold, confirmed. Perfect.

¶ 53 After proper argument on self-defense and other issues, the prosecutor returned to his improper "fabrication" argument:

This is December of '91. He was referred by his attorney for psychological evaluation. When he was asked if he was depressed or nervous, he thought for a while and he says he feels naturally depressed for being in jail. This is '91. See

it kind of develops, ladies and gentlemen, as it gets along.

¶ 54 A few moments later, the prosecutor argued that the mental health experts were "mouthpieces" for Defendant. "And what do you hear—what are you hearing from these doctors? You are hearing the defendant. They are only telling you what the defendant told them." A few moments later, the prosecutor returned to the "fabrication" argument again, stating, "So February '92, ladies and gentlemen, we get a request for Rule 11 proceeding, court proceedings, in this matter. Not August, September, October, November, December [of '91]." The objection was sustained.

¶ 55 The prosecutor soon merged his "mouthpiece" argument into an improper comment on Defendant's failure to testify, after first suggesting that psychiatry was an impediment to truth and justice:

[Defense counsel] wants you to make your decision based on what Dr. Potts has to say and ignore the evidence in this case. He wants you to forego and to give up and to relinquish . . . [your right] to pass judgment, for you to act as a member of this community and to decide, ladies and gentlemen.

Not Dr. Potts, not some $4,000 or $6,000 hired doctor who wants to come in here. . . . I mean you stand, ladies and gentlemen, between this great power of psychiatry and truth and justice here. I mean, ladies and gentlemen, Dr. Potts, Dr. Belan, they could no more tell you what was going on inside of that man's mind than they can tell you whether or not he was abducted by a UFO. . . .

The only way you know what is inside of a person's mind is to look at their words and actions at the relative times, shortly before, during, and shortly after the commission of the offense. And you do that job. I mean, after all, this is a jury trial, it is a search for the truth. You know, bring your witnesses in here, prove your case. You know, have them testify. Cross-examine them. Evaluate their demeanor when they are testifying, their manner while testifying. Any bias or prejudice they might have. And Mr. Cornell wants you to find

this defendant not guilty by reason of insanity based on what the defendant himself is saying. I mean that's it, that's it, that's what the defendant himself is saying because there is no other evidence here to justify a not guilty by reason of insanity verdict, other than what the defendant is saying and what he's told everybody else in this case. All these other psychiatrists or psychologists, or whoever they may have been.

And you know he lies. You know he's got a motive for lying. That's what you have seen here ladies and gentlemen. You've seen the defendant testifying, except it was in the form of a doctor, all suited up nice and neat, a tie, shirt, suit, nice and presentable, good credentials and everything else. But what was it that was being said? Who was speaking? He was a mouthpiece for the defendant. That's all you've seen here. This is not a science, it's an art. It's an art. It's guesswork.

He's related—Dr. Potts has related to you only what the defendant told him, only the words the defendant uttered, and from that conclusion, he's decided he was insane. That he was suffering from paranoid schizophrenia.

A few moments later, the prosecutor rhetorically asked if the basis of the doctors' opinions was "what the defendant's been telling you all along?" He then answered the question by stating, "It's the defendant who's testified." Defendant had not testified.

¶ 56 The prosecutor then got the jurors thinking about how guilty they would feel if they found Defendant not guilty by reason of insanity and heard about a murder in the future:

[Y]ou know, the next time you are out on a nice, pretty, sunny afternoon, perhaps with your family, and you are driving along the roads or maybe you are at a picnic, your radio is on and you hear about a murder or something like that, or an aggravated assault, you think back to this case. You are going to have to be able to say right then and there that you were convinced … that the evidence was clear and convincing that this man was insane. Not just paranoid schizophrenic, not mentally ill, not possibly

mentally ill, but insane. Because you know, you go back there in your deliberation now and you are sitting there and you can't imagine that day, ladies and gentlemen, when you hear this on the report and you can't say, yes, I was clearly convinced, you know, that the defendant carried his burden.

The objection was overruled.

¶ 57 After the prosecutor finished, Mr. Cornell requested ten minutes of surrebuttal on the insanity defense. The trial court, which had previously denied a similar request, again denied it. After the jury was instructed, Mr. Cornell moved for a mistrial, arguing that the prosecutor's reference to the Rule 11 evaluation in February 1992 was prejudicial error, as was the comment about jurors hearing about a future murder. The motion was denied.

### Misconduct in the "Fabrication" Argument

¶ 58 Defendant cites many incidents of prosecutorial misconduct on the "fabrication" issue. Defendant failed to object to many of these incidents at trial. Failure to object waives an issue on appeal absent fundamental error. *See State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). However, when counsel has made the court aware of his objection through a previous motion, failure to object at trial does not then waive the issue on appeal. *See State v. Grannis,* 183 Ariz. 52, 62, 900 P.2d 1, 11 (1995); *State v. Lindsey,* 149 Ariz. 472, 476, 720 P.2d 73, 77 (1986). Although counsel did not object every time the prosecutor made an improper "fabrication" assertion or insinuation, he did make frequent objection on that subject at trial, and in pre-trial proceedings. We conclude that the issue was fully preserved.

¶ 59 Counsel can argue all reasonable inferences from the evidence. *See State v. Dumaine,* 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). Counsel's questioning and argument, however, cannot make insinuations that are not supported by the evidence. *See Cornell,* 179 Ariz. at 331, 878 P.2d at 1369; *State v. Williams,* 111 Ariz.

511, 515, 533 P.2d 1146, 1150 (1975). It is improper for counsel to imply unethical conduct on the part of an expert witness without having evidence to support the accusation. *See Bailey*, 132 Ariz. at 479, 647 P.2d at 177. Jury argument that impugns the integrity or honesty of opposing counsel is also improper. *See State v. Denny*, 119 Ariz. 131, 134, 579 P.2d 1101, 1104 (1978); *State v. Gonzales*, 105 Ariz. 434, 436, 466 P.2d 388, 390 (1970).

¶ 60  In *Cornell*, the prosecutor insinuated during cross-examination that counsel taught defendant how to fake epilepsy. 179 Ariz. at 330–31, 878 P.2d at 1368–69. Because the record did not support the insinuation, the prosecutor had "unfairly cast aspersions on advisory counsel's integrity." *Id.* at 331, 878 P.2d at 1369. The prosecutor was guilty of misconduct. *See id.* at 332, 878 P.2d at 1370. We did not reverse, however, because defendant failed to object, the misconduct was not fundamental error, and it did not undermine defendant's primary defense. *See id.* Here, however, Defendant objected, the prosecutor's misconduct was intended to undermine Defendant's primary defense, and it did so.

¶ 61  This record reveals a prosecutor with an overpowering prejudice against psychiatrists and psychologists, among others. He told the court, "psychiatrists should be precluded entirely from testifying in criminal matters," and he repeatedly refused to retain a mental health expert for the State. The State has no obligation to retain a mental health expert in a case such as this, but the State has an obligation to be honest with the facts. The prosecutor's reason for not retaining a mental health expert in this case was obvious; doing so would impair his trial strategy of ignoring the facts he did not like, relying on prejudice, and arguing that all mental health experts are fools or frauds who say whatever they are paid to say. That is a dishonest way to represent the State in any case, and it was especially dishonest in this case, where the evidence of mental illness was overwhelming, where the evidence of insanity was substantial, and where the State had no evidence that defense counsel or expert witnesses had fabricated an insanity defense.

## Misconduct in the "He Lies" Argument

¶ 62  Defendant argues that the "You know he lies" argument, quoted in ¶ 55, was improper comment on the exercise of his Fifth Amendment right not to testify. Defendant did not object to this argument at trial, meaning that the claim is waived absent fundamental error. *See Gendron*, 168 Ariz. at 154, 812 P.2d at 627. Fundamental error is that which is "clear, egregious, and curable only via a new trial." *Id.* at 155, 812 P.2d at 628. Fundamental error is " 'error going to the foundation of the case, error that takes from defendant a right essential to his defense, and error of such magnitude that defendant could not possibly have received a fair trial.' " *Bible*, 175 Ariz. at 572, 858 P.2d at 1175 (quoting *State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984)). In determining whether error is fundamental, we look to the entire record and to the totality of the circumstances. *See Bible*, 175 Ariz. at 572, 858 P.2d at 1175; *Gendron*, 168 Ariz. at 155, 812 P.2d at 628. Considering those matters, which is to say, considering the cumulative effect of the prosecutorial misconduct that permeated this trial, we conclude that the improper comment on Defendant's failure to testify was fundamental error.

¶ 63  The prosecutor who comments on defendant's failure to testify violates both constitutional and statutory law. *See* Ariz. Const. art. 2, § 10; A.R.S. § 13-117(B) (1989); *State v. Schrock*, 149 Ariz. 433, 438, 719 P.2d 1049, 1054 (1986). Although an improper comment on defendant's failure to testify can be harmless error in some cases, *see State v. Guerra*, 161 Ariz. 289, 297, 778 P.2d 1185, 1193 (1989), in other cases it can be fundamental error. *See State v. Smith*, 101 Ariz. 407, 410, 420 P.2d 278, 281 (1966) (citing *Rutledge v. State*, 41 Ariz. 48, 15 P.2d 255 (1932), for the proposition that fundamental error will be found if "the general conduct of the prosecuting counsel was such that it must be presumed to have resulted in a miscarriage of justice"). The error can be fundamental whether the comment is direct or indirect. *See State v. Jordan*, 80 Ariz. 193, 199, 294 P.2d 677, 681 (1956).

¶ 64 To be improper, "the prosecutor's comments must be calculated to direct the jurors' attention to the defendant's exercise of his fifth amendment privilege." *State v. McCutcheon*, 159 Ariz. 44, 45, 764 P.2d 1103, 1104 (1988). "[T]he statements must be examined in context to determine whether the jury would naturally and necessarily perceive them to be a comment on the failure of the defendant to testify." *Schrock*, 149 Ariz. at 438, 719 P.2d at 1054 (citing *State v. Christensen*, 129 Ariz. 32, 39, 628 P.2d 580, 587 (1981)).

¶ 65 The State argues that the "he lies" argument, when read in context, is proper comment on "the basis for the expert's opinion regarding [Defendant's] mental illness" and is not improper comment on Defendant's failure to testify. We doubt it. Just before the "he lies" argument, the prosecutor argued that you prove your case with witnesses who can be cross-examined, but all the jury had heard from Defendant was "what he's told everybody else":

> I mean, after all, this is a jury trial, it is a search for the truth. You know, bring your witnesses in here, prove your case. You know, have them testify. Cross-examine them. Evaluate their demeanor when they are testifying, their manner while testifying. Any bias or prejudice they might have. And Mr. Cornell wants you to find this defendant not guilty by reason of insanity based on what the defendant himself is saying. I mean that's it, that's it, that's what the defendant himself is saying because there is no other evidence here to justify a not guilty by reason of insanity verdict, other than what the defendant is saying and what he's told everybody else in this case. All these other psychiatrists or psychologists, or whoever they may have been.

¶ 66 The prosecutor's argument that Dr. Potts was Defendant's mouthpiece is similar to the improper argument in *State v. Trostle*, 191 Ariz. 4, 16, 951 P.2d 869, 881 (1997). There, the prosecutor told the jury that only two people knew details about the crime: "'One is Jack Jewitt and the other one is sitting right here at the table asking you not to hold him accountable through his law-

yer.'" *Id.* We held that the statement was an impermissible comment on defendant's failure to testify, but the error was harmless in light of the overwhelming evidence of guilt. *See id.* In the present case, the evidence of Defendant's guilt was overwhelming, but the evidence of his sanity was not. Here, the evidence of Defendant's mental illness was overwhelming, the evidence of his insanity was substantial, and the State called no experts. The State did overwhelm the insanity defense in this case, true, but it did not do so with evidence; it did so with prosecutorial misconduct.

### Misconduct in the Appeal to Fear

¶ 67 Defendant argued that the "you hear about a murder" argument, quoted in ¶ 56, "was a direct attempt to try and prejudice the jury, put the fear in them that if they acquit Mr. Hughes, that, number one, he'll probably get out of custody, and number two, he will be uncontrolled and he'll be violent." The trial court found no error; it remarked that this "is the same argument that is often used in defense cases of, ladies and gentlemen, this is the only time you will ever be able to vote on the defendant being not guilty. You don't get to do it twice, you don't get to, someday down the road, it is the similar argument." We disagree.

¶ 68 The defense argument referred to by the trial court is a reminder to the jurors of the finality of their decision; it is not a suggestion that the jurors will feel responsible for future crimes unless they reject the insanity defense. Also, when defense counsel makes a "this is the only time" argument, the prosecutor gets the last word in rebuttal. Here, Defendant had the burden of proof on the insanity defense, but the State had the last word on it. Whether to allow defense counsel surrebuttal on the insanity defense is within the trial court's discretion. *See State v. Turrentine*, 152 Ariz. 61, 65, 730 P.2d 238, 242 (App.1986) (holding that Rule 19.1(a), Arizona Rules of Criminal Procedure, gives the trial court discretion whether to allow surrebuttal by defendant on the insanity defense).

¶ 69 Counsel have wide latitude in closing argument. *See Dumaine*, 162 Ariz. at 401,

88

783 P.2d at 1193. It is improper, however, for a prosecutor to draw the jury's attention to the potential disposition if defendant is found not guilty by reason of insanity. *See Cornell*, 179 Ariz. at 327, 878 P.2d at 1365 ("A long line of our cases has held that this type of statement is improper."); *State v. Purcell*, 117 Ariz. 305, 308, 572 P.2d 439, 442 (1977) ("We have held that it is error for a prosecutor to initiate such an argument.").

¶ 70   A prosecutor can certainly argue that Defendant has the burden of proving insanity by clear and convincing evidence, for that is the law. *See* A.R.S. § 13–502 (1989). However, the comment about a future "murder or something like that" is an improper appeal to fear. In *State v. Makal*, 104 Ariz. 476, 478, 455 P.2d 450, 452 (1969), the prosecutor ended his rebuttal by imploring the jury, "Don't arrive at a verdict which will give Mr. Makal the opportunity to kill again," meaning that the jury should reject the insanity defense. In reversing, we noted, "Every jurisdiction which has passed upon a similar argument has held that it is erroneous misconduct on the part of the prosecuting attorney." *Id.*

¶ 71   The State asserts that the prosecutor was referring to future crimes in general, not to future crimes by Defendant. We seriously doubt that this prosecutor was trying to walk that line. He referred to the same violent crimes that Defendant had committed, and he associated those future crimes with the consequence of finding Defendant not guilty by reason of insanity. The improper inference is clear, in a trial and an argument as permeated by prosecutorial misconduct as this one.

¶ 72   The State argues that more direct commentary about future crimes has been found to be non-reversible. *See State v. McLoughlin*, 133 Ariz. 458, 462–63, 652 P.2d 531, 535–36 (1982); *State v. Marvin*, 124 Ariz. 555, 557, 606 P.2d 406, 408 (1980); *State v. Garrison*, 120 Ariz. 255, 257, 585 P.2d 563, 565 (1978). These cases are distinguishable. *McLoughlin* granted a new trial on other grounds and cautioned the prosecutor to "take care to choose words that cannot be construed to refer to future conduct." *Id.* at 463, 652 P.2d at 532. Neither *Marvin* nor *Garrison* involved an argument suggesting that defendant would be back on the street unless the jury rejected the insanity defense.

¶ 73   In *Cornell*, where the prosecutor questioned an expert witness about defendant's possible release if found not guilty by reason of insanity, we concluded that the questioning raised an issue that was both irrelevant and prejudicial. *Id.* at 327–28, 878 P.2d at 1365–66. The error was harmless in *Cornell* because the evidence of insanity was sparse, it was based on a new theory in psychology, and the State's two experts testified that Defendant was sane and was probably malingering. *Id.* at 330, 878 P.2d at 1368. We cannot find harmless error here, where the evidence of mental illness was overwhelming, where the evidence of insanity was substantial, and where the State called no mental health expert.

¶ 74   We hold that the cumulative effect of the prosecutor's misconduct deprived Defendant of a fair trial. We do not have to decide which of the prosecutor's misconduct would have been reversible error without the rest of the prosecutor's misconduct.

¶ 75   Reversed and remanded for a new trial.

ZLAKET, C.J., and JONES, V.C.J., FELDMAN and MARTONE, JJ., concur.